## STATE v. HILL.

No. 2527. Decided January 28, 1914 (138 Pac. 1149).

HOMICIDE—WEIGHT OF EVIDENCE—IDENTITY OF ACCUSED. Evidence, in a prosecution for murder occurring during an attack in a saloon in which one of the robbers was killed and one escaped, *held* insufficient to identify accused as the escaped man, and to justify conviction.

APPEAL from District Court, Third District; *Hon. F. C. Loofbourow,* Judge.

J. A. Hill was convicted of murder in the first degree and he appeals.

REVERSED AND REMANDED WITH DIRECTIONS TO GRANT A NEW TRIAL.

*Russel G. Schulter* and *George F. Wasson* for appellant.

*A. R. Barnes,* Attorney-General, and *E. V. Higgins,* and *G. A. Iverson,* Assistant Attorneys-General for the State.

McCARTY, C. J.

The defendant, J. A. Hill, was convicted in the district court of Salt Lake County of murder in the first degree, alleged to have been committed at Midvale, in said county, on the 7th day of August, 1912. The court, on the recommendation of the jury, sentenced the defendant to life imprisonment at hard labor. To reverse the judgment, defendant prosecutes this appeal.

The evidence shows that on the evening of August 7, 1912, between the hours of nine-thirty and ten o'clock p. m., two men wearing masks entered the Vienna saloon in Midvale, and, pointing loaded revolvers at four persons in the saloon, ordered them to hold up their hands. The four persons were Frank Colclough, the night marshal of Midvale, and three Austrians, namely, Paul Sherrich, who was tending bar, Mike Lamich, and Mike Kavachivich. The two robbers, on discovering the night marshall in the saloon, commenced shooting. Colclough, the marshal, was shot and almost instantly killed. Shots were also fired by Paul Sherrich, the bartender; Charles Gammett, one of the robbers also was shot and mortally wounded. He died some two days later. The other robber ran out of the front door of the saloon and escaped.

The important question presented by the appeal, and the only one we deem necessary to consider, is: Does the evi-

dence establish the identity of the defendant as the robber who entered the saloon with Gammett and engaged in the commission of the crime alleged?

The theory upon which the case was presented and tried on the part of the State is that the defendant, Charles Gammett, and one Jack Callaghan participated in the killing of Colclough; defendant and Gammett taking part in the shooting, and Callaghan acting as a guard or "lookout" on the outside. The evidence shows that the defendant, Callaghan, and Gammett were, for several years next preceding the crime, acquainted with each other, and had on different occasions associated together as miners working in different mines, and were on more than ordinarily friendly terms. As such they were together in Butte, Mont., at Bingham, Utah, and in Salt Lake City. There is evidence tending to show that they were together at Midvale in the afternoon of the day on which the crime was committed. The defendant introduced evidence tending to show that he was not in Midvale, or in the vicinity therof, on that day. He testified that he never was there, except on one occasion when he passed through the town on a train. We think it is sufficient to here state, without setting forth in detail the facts, that there is ample evidence to support a finding by the jury that defendant was at Midvale, and there was some evidence that he was in and about the Vienna saloon in the forenoon and in the afternoon of the day on which the homicide occurred. The evidence also shows that defendant, a few days after the homicide, went to work in Snake Creek tunnel, in Wasatch County, and continued to work there under the name of Wilder until he was arrested for the crime charged September 6, 1912. The changing of his name undoubtedly was a suspicious circumstance of more or less weight, but was not, within itself, sufficient to connect the defendant with the commission of the crime. The defendant testified that he went to work under an assumed name because two friends of his, Harry Walker and a man known as "Hardrock" Johnson, met him a short time before he applied for work and stated to him: "You

44 Utah—6

were a good friend of Gammett, and they might suspect you of that (referring to the homicide)." "I said: 'No danger of that.' They said: 'Well, you better change your name anyway and be careful and look out for yourself. . . . You have got guns on you, and they are liable to think you are the fellow who done that because you came up from Salt Lake the next morning." The foregoing is a general outline of the facts regarding the whereabouts of the defendant a short time prior to the homicide, as shown by the evidence, and of his movements and conduct in a general way from about August 10th, three days after the homicide, until he was arrested September 6th.

Royal W. Stokes, city marshal of Midvale, was called as a witness by the State, and, on cross-examination, testified that he was notified of the homicide and came to the saloon a few minutes after the shooting occurred; that Gammett was in great pain, having been "shot over the eyebrow, in the wrist, and in the leg." He further testified, without objection, that he inquired of Gammett the name of his confederate, and he replied that "it was a fellow I met in Salt Lake," and that he did not know his name. "I said, 'What's your partner's name? he is killed,' and he said, 'It serves the —— right, he ought not to have gone into a Dago joint,' and also that he did not know his name; that he met him in Salt Lake. I asked him what his companion's name was, and he said, 'didn't you ask him,' and I said 'No; he is killed.' "

The undisputed facts show that the defendant is of light complexion, about five feet nine or ten inches in height, has blue eyes, a short and somewhat thick or chubby nose, and at the time of the homicide weighed from 153 to 158 pounds.

We now come to the proceedings by which the State sought to identify the defendant as the robber who entered the saloon with Gammett and participated in the killing of Colclough. The robber who made his escape was seen by Sherrich, Lamich, and Kavachivich, the three Austrians who were in the saloon, one of whom, Sherrich, took part in the shooting. Two other men, George R. Carlston and John Redman, who claimed to have been in the street near the

saloon and heard the shooting, testified that they saw the escaped robber runing out of the saloon, down the street and disappear in the darkness. The three Austrians were called by the State. They could not speak, nor did they understand the English language, and hence gave their testimony through an interpreter.

Lamich testified, in part, as follows:

"Q. How did the height of the man that got away with the blue handkerchief on his face compare with the height of this defendant, Mr. Hill? A. I don't know whether it is him or not, but the height compares just about like Mr. Hill. Q. Was the man who got away about the same size as Mr. Hill? A. He might have been a little bit larger or smaller, I did not look. . . . I was so scared I did not know where I was standing."

Kavachivich testified:

"I am six feet three inches tall; weigh 194 pounds. The man who got away was tall, but I can't say whether he was as tall as I am or not. Q. Do you think he would weigh as much as you weigh? A. I don't know how much he would weigh."

Sherrich testified, in part, as follows:

"Had you ever seen Gammett before you saw him when he was shot. A. Yes. . . . I saw him that same day between ten and eleven o'clock in the forenoon. Q. Who, if any one, was with him? A. There were only two together. Q. Who was the other one? A. Well, I can't tell. Q. You say you can't tell? A. Yes. . . . Q. Who was the other man that was with Gammett when you saw them in the morning, if you know? A. I saw Gammett, and I guess this fellow (referring to the defendant). Q. Now, tell the jury why you think it was the defendant that you saw with Gammett? A. That is my best, he was the same high and the same heavy. Q. Did you see the defendant's face that morning? A. No; I did not see him very well." Cross-examination: "Q. You did not see that man's face that morning? A. Not quite." Direct examination: "Q. Had you ever seen the defendant before that time? A.

Never. Q. Do you know now who the man was that was with Gammett at that time? A. I think. Q. And who do you think it was? A. I think it was Mr. Murphy."

The record shows that defendant was sometimes known as Murphy. The witness, after referring to what he did and observed just prior to and at the time of the homicide, further testified that Gammett and his companion entered the saloon by the front door when one of them said, "Hands up;" that he thought "it was just for fun;" that, when the robbers commenced shooting, he shot, firing three shots, hitting and mortally wounding Gammett. He further testified:

"Q. How close did you get to the companion of Gammett? A. Oh, about ten or twelve feet. . . . I can't see him; he was behind. How close did you get to Gammett while the shooting was going on? A. About ten feet. I don't think it was that far. Q. How close did you get to the other fellow? A. I did not see the other one. I turned my back to him. . . . Q. Who was that man? A. I don't know. Q. What is your best judgment as to who he was? A. I think it is the one sitting there. Q. Why do you think so? A. By the size and by the body of his."

On cross-examination, the witness admitted that he testified at the preliminary hearing as follows:

"Q. Both men had similar overalls on? A. (As given by interpreter) He says he did not see the other one at all, and he cannot tell whether he had the same kind or not. . . . Q. According to your best judgment, what would the escaped holdup weigh? A. . . . 190 or 200 pounds. Q. Was he thin? A. He said he was something like Gammett. Q. How tall are you? A. Five feet eleven. Q. How did their size compare with yours? A. Bigger. Q. Taller? A. Taller, yes. Q. Very much taller? A. Not very much. Q. Did you stand up by the side of one of these fellows? A. He says he was right on him—had the gun in his breast. Q. Did he appear to be taller than you? A. He said yes. Q. And which one was that? A. The one that escaped. Q. (Question repeated.) What would the escaped holdup weigh? A. He said around 190 or 200

pounds."- Counsel for the defendant then remarked: "You remember saying that down there?" (referring to the preliminary examination before the magistrate). The witness answered, "Yes, I remember I gave it," and then answered "No" to the question "You don't want to change it now, do you?"

John Redman, a resident of Midvale, was called as a witness by defendant, and testified that on the night of the homicide, as he was walking along the sidewalk near the Vienna saloon, he heard a shot and ran to an open side door of the saloon, looked in, and saw a man fall; that he immediately ran from the saloon to notify an officer, and, as he came away, he saw a man in a "crouched and bended over" position come out of the front door of the saloon to the sidewalk, straighten up, and run across the street; that, as the man came out of the saloon, several shots were fired in quick succession. "Q. What is your best judgment as to the size and weight of that man? A. . . . . 180 to 190 pounds. Q. You have stated that you saw Mr. Gammett then? A. Yes, sir, . . . I could see that he was a very large man. Q. How did the man who ran out of the place compare in height with Mr. Gammett? A. . . . Pretty near the same size." Cross-examination: "Q. You think that man was quite a tall man? A. Yes, sir, I do. Q. You judge he would be a man five feet eleven, or six feet. A. He looked a big man to me."

George R. Carlston, a witness for defendant, testified that on the evening of August 7, 1912, at about nine o'clock, he was in Midvale, walking on the street opposite the Vienna saloon; that he heard several shots fired in one of the saloons; that he ran across the street to the curb of the sidewalk in front of the Vienna saloon; that he saw a man come out of the saloon "in a crouching position . . . with a gun in his hand," straighten up, and run down the street; that at the time he came out "the handkerchief had dropped from his face. Q. Did you see his face at that time? A. Yes, sir. Q. Do you know what complexion he was? A. I take it that he was a dark-complexioned man. Q. Do you know

whether or not this gentleman sitting here is the man? A. No, sir, he is not. . . . I would judge the man to stand about six foot or six foot one, and to weigh in the neighborhood of 190 pounds." Cross-examination: "Q. You said this man's weight was about 190 pounds? A. Which man? Q. That you saw run out of the saloon. . . . ? A. I would judge that he would weigh in the neighborhood of 190 or 195 pounds. . . . Q. 180 to 190 would suit you better? A. No, sir." Redirect: "Q. Did you see any of the features of that man? A. I would judge that the man was a dark-complexioned man. I have him pictured in my mind as a man with a stubby growth of whiskers. I could not be positive, but I judge that he had a fairly good sized nose."

The undisputed evidence shows that Gammett, the robber who was mortally wounded, was about six feet two inches in height.

The foregoing is substantially all of the evidence bearing upon the question of identity of the defendant.

The defendant, at the close of the state's case in chief, moved the court for a directed verdict in his favor on the ground that the evidence wholly failed to connect him with the commission of the crime charged. When the evidence was all in and both sides had rested, defendant again asked for a peremptory instruction directing a verdict in his favor. The refusal of the court to direct a verdict as requested is assigned as error. This involves the sufficiency of the evidence to justify the verdict rendered.

When the state rested the only evidence identifying the defendant as the robber who escaped was that given by the three Austrians. Neither of them saw his face. As we have stated, Mike Lamich, one of the Austrians, in describing the robber, said: "I don't know whether it was him (defendant) or not, but the height compares just about like Mr. Hill." When asked about the size of the man, he said: "He might have been a little bit larger or smaller (than Mr. Hill). I did not look. . . . I was so scared I did not know where I was standing." This evidence does not in the remotest degree tend to identify the defendant as the robber. Kava-

chivich testified that he was six feet three inches tall and that his weight was 194 pounds; that the robber who escaped "was tall," but that he could not say whether the robber was as tall as he or not. When asked the question, "Do you think he would weight as much as you weigh," the witness, in effect, disclaimed having an opinion as to whether he weighed more or less than the robber. In fact, his meager and vague description, if it shows anything, rather tends to show that the robber was much taller than the defendant. The testimony of Sherrich, the bartender, considered in its entirety, also tends to show that the robber who escaped was much larger than the defendant. The evidence shows that Sherrich is five feet eleven inches in height. On cross-examination, he admitted that he testified at the preliminary hearing that the robber was taller than he (Sherrich); that the robber was "about like Gammett;" that he "would not say which was the tallest;" and that he did not want to change his testimony given at the preliminary examination. On his direct examination, he was asked by the district attorney, "Who was that man?" (referring to the robber who entered the saloon with Gammett), and he answered, "I don't know." "Q. What is your best judgment as to who he was? A. I think it is the one (defendant) sitting there. Q. Why do you think so? A. By the size and by the body of his." In other words, the witness, after describing a man much larger than the defendant, states as his conclusion that defendant was that man. The testimony of the three Austrians, as stated, when considered as a whole, tends to show that defendant is not the man who participated with Gammett in the killing of Colclough. Their evidence is corroborated by the testimony of Carlston and Redman. Carlston not only describes the robber as being much larger than the defendant, but also as having a different complexion. We think the evidence not only fails to establish identity, but it affirmatively shows that the defendant was not the robber. The trial court therefore erred in refusing to give the peremptory instruction requested by the defendant.

The judgment is reversed, and the cause remanded to the lower court, with directions to grant a new trial.

STRAUP and FRICK, JJ., concur.