## COBB v. HARTENSTEIN.

No. 2772. Decided October 7, 1915 (152 Pac. 424).

1. PARTNERSHIP—DEATH OF PARTNER—RIGHTS OF SURVIVOR. Under Comp. Laws 1907, Sec. 3918, providing that on death of a partner the firm's affairs shall be settled by the surviving partner, and not the representative of the deceased one, a surviving partner is entitled to sue to recover payments on a usurious contract, notwithstanding section 1241x2, providing for recovery of such payments, authorizes suit by the borrower or his personal representative. (Page 182.)

2. APPEAL AND ERROR—PRESENTATION OF GROUNDS OF REVIEW IN COURT BELOW—NECESSITY. Under Comp. Laws 1907, Sec. 2966, 2967, requiring objections other than those specified as grounds for demurrer to be taken by answer, and that, where no such objection is taken by demurrer or answer, they shall be waived, the contention cannot for the first time be raised on appeal that the suit should not have been brought in the name of the surviving partner, but should have been brought by the deceased's representative.[1] (Page 182.)

3. USURY—CONTRACTS—CONSTRUCTION. As the taking of usurious interest is a misdemeanor, the courts, in determining whether a contract is usurious, will always, if two constructions are possible, take the one against usury. (Page 183.)

4. USURY—CONTRACTS—CONSTRUCTION. A contract, to be usurious, must be so at the time made. (Page 184.)

5. USURY—CONTRACTS—FORM. Where there is a corrupt or unlawful intention to violate the usury law, the courts will disregard the form that the contract may take. (Page 184.)

6. USURY—CONTRACTS—ESSENTIALS. A corrupt or unlawful intent

to violate the usury law, at least on the part of the lender, is an essential to render a contract usurious.[2]    (Page 184.)

7. USURY—CONTRACTS—BURDEN OF PROOF.  In a proceeding to recover back under Comp. Laws 1907, Sec. 1241x2, payments of usury plaintiff is not bound to establish the usury beyond a reasonable doubt; the action being a civil one at law, and not criminal.[3]    (Page 187.)

8. USURY—CONTRACTS—EVIDENCE—SUFFICIENCY.  In a suit to recover alleged usurious payments, evidence *held* insufficient to show that the lender had the unlawful intent to extort usury.  (Page 188.)

9. EVIDENCE—SUFFICIENCY TO SUPPORT VERDICT.  Where recovery in a civil action depends upon a number of elements, a general verdict in favor of recovery cannot stand unless there is substantial evidence in support of each element.[4]    (Page 194.)

10. APPEAL AND ERROR—REVIEW—VERDICTS.  A general verdict cannot be upheld on appeal, where there is no substantial evidence in favor of some of the elements which are assumed to exist.  (Page 194.)

11. USURY—WHAT CONSTITUTES—QUESTION OF LAW.  Whether a transaction is usurious or not is a mixed question of law and fact, the facts of the transaction being for the jury, and the question whether they constitute usury being for the court.  (Page 194.)

12. STATUTES—VALIDITY—TITLE.  The title of the original statute now found under Comp. Laws 1907, Sec. 1241x2, providing in cases of usury for recovery of the principal sum, is sufficiently broad to be valid under the Constitution.[5]    (Page 197.)

13. COSTS—ON APPEAL—BRIEFS.  While counsel may repeat the evidence in some instances in their briefs for the convenience of the court, yet costs cannot be awarded for unnecessary repetitions of evidence in the briefs which is in the abstract.  (Page 198.)

---

[1]*Insurance Co.* v. *Railroad Co.*, 44 Utah 26; 137 Pac. 653.

[2]*Fisher* v. *Adamson*, 46 Utah ...; 151 Pac. 351.

[3]*Culmer, etc., Co.* v. *Gleason*, 42 Utah 344; 130 Pac. 66; *Brown* v. *Johnson*, 43 Utah 1; 134 Pac. 590; 46 L. R. A. (N. S.) 1157; *Fisher* v. *Adamson*, 46 Utah 1; 151 Pac. 351.

[4]*State* v. *Hill*, 44 Utah 79; 138 Pac. 1149; *State* v. *Blank*, 43 Utah 211; 134 Pac. 735; *State* v. *Potello*, 40 Utah 56; 119 Pac. 1023; *State* v. *Powell*, 45 Utah 193; 143 Pac. 588; *State* v. *Sheffield*, 45 Utah 426; 146 Pac. 306.

[5]*Marioneaux* v. *Cutler,* 32 Utah, 475; 91 Pac. 355; *Edler* v. *Edwards*, 34 Utah 13-19; 95 Pac. 367; *Naylor* v. *Crabbe*, 148 Pac. 359; *Martineau* v. *Crabbe*, 46 Utah 327; 150 Pac. 301.

Appeal from District Court, Third District; Hon. *Geo. G. Armstrong*, Judge.

Action by Rufus K. Cobb, as sole surviving partner of the firm of R. K. Cobb & Co., against Emanuel A. Hartenstein.

Judgment for plaintiff. Defendant appeals.

REVERSED and REMANDED.

*Van Cott, Allison & Riter, Howat, Macmillam & Nebeker,* and *Dickson, Ellis, Ellis and Schulder* for appellant.

*Ball, Mulliner & McCarty* and *Dey, Hoppaugh & Fabian* for respondent.

## APPELLANT'S POINTS.

Since usury laws are quasi-penal, the courts will not hold a contract to be in violation of the usury laws, unless upon a fair and reasonable construction of all its terms, in view of the dealings of the parties, it is manifest that the intent of the parties was to engage in such a transaction as is forbidden by those laws. If two reasonable constructions are possible, by one of which the contract will be legal and valid, while by the other it will be usurious and invalid, the court will always adopt the former. In short, the general rule of interpretation and construction of such contracts may be said to be, that the contract is not usurious when it may be explained on any other hypothesis. (39 Cyc. 917-18; *Gillette* v. *Ballard,* 25 N. J. Eq. 491; *Insurance Co.* v. *Crane,* 25 N. J. Eq. 422; *Lusk* v. *Smith,* 81 Pac. 173, 175; *Hamilton* v. *Fitch* (Kirby), 260, 262; *Steptoe* v. *Harvey,* 7 Leigh 501, 538-9; *Gilpin* v. *Enderly,* 5 Barnwell & Adolphus, 954 (7 Eng. C. L. R.) ; *White* v. *Benjamin* (N. Y.), 33 N. E. 1037.) To constitute the offense of usury, there must be an intent to violate the statute. (39 Cyc., p. 919; *United States Bank* v. *Wagner,* 9 Pet. 378, 399; *Kline* v. *Title Guaranty & Surety Co.,* 166 Fed. 365, 368-9; same case on appeal, 178 Fed. 689, 691; *Thurston* v. *Cornell,* 38 N. Y. 281; *Orvis* v. *Cartin,* 52 N. E. 690 (N. Y.) ; *Call* v. *Palmer,* 116 U. S. 101.) As a mat-

ter of law the transaction was a loan. The buyer sixty imposed upon Cobb the absolute obligation to pay the money at the end of sixty days. (*Nichols* v. *Bishop*, 136 Mass. 349; *Vance* v. *Newman*, 80 S. W. 574.) Hartenstein therefore took no chances. His only risks were the depreciation of the security or the insolvency of the debtor. These were the ordinary risks upon loaning money and are not such hazards as destroy the usurious character of the transaction. (*Rowe* v. *Gunson*, 25 How. Pr. 360; *Phillipp* v. *Kirkpatrick*, Add. 124 [Pa. 1793].) A loan may be made though neither the lendor or the borrower have ever heard the word "loan," "lend" or "borrow." Usury may be taken though the usurer never heard of the word "usury" or "interest." As said by the Court of Appeals of New Jersey in *Freeman* v. *Brittin*, 17 N. J. Law, 191, 206:

"It is not necessary in order to constitute a loan, that there should be in very terms, an application to borrow, or an agreement to lend. Every advancement of money, for the accommodation of another, to be repaid to the person making the advance, by the one receiving it, or by any person for him, or by or out of his funds, is literally and legally, a loan of money."

It is not possible in this transaction that Hartenstein when purchasing the stock from Cobb was bargaining for the use of the stock, because, as shown by the testimony of Mr. Badger and as provided by the rules of the Exchange, Hartenstein would be prohibited from using the stock in any manner. He merely held it as escrow holder to return the specified shares. Such a contract is usurious on its face. (*Hall* v. *Haggart*, 17 Wend. 280; *Colton* v. *Dunham*, 3 Paige 272; *Delano* v. *Rood*, 6 Ill. 690; *Knox* v. *Black*, 1 A. K. Marshall 200; *Heytle* v. *Logan*, 1 A. K. Marshall 529; *Bright* v. *Wagle*, 33 Ky. 252; *Starkweather* v. *Prince*, 1 McArthur, D. C. 144; *Stockwell* v. *Richardson*, 5 N. E. 45; *Baker* v. *Arnot*, 67 N. Y. 448; *Tillan* v. *Cleveland*, 47 Ark. 287; *Wormley* v. *Hamburg*, 46 Iowa 144; *Dale* v. *Duryea*, 96 Pac. 223.) Nor did the ignorance of both Cobb and Hartenstein (assuming Hartenstein to have been ignorant) as to the rate of interest charged or the legal phases here involved, affect the transaction. The in-

tent of the parties is to be determined by the act, which the circumstances show the parties intended to accomplish. (*Fielder* v. *Darrin,* 50 N. Y. 437; *Nelson* v. *Satre,* 126 N. W. 339; *Hagan* v. *Barnes,* 99 N. W. 415.) Nor does the custom of the brokers change the situation. (*Dunham* v. *Dey,* 13 Johns. 39; *Dunham* v. *Gould,* 16 Johns 367; *N. Y. Fireman Ins. Co.* v. *Ely,* 2 Cowan 678; *Niagara Co. Bank* v. *Baker,* 16 Ohio St. Rep. 68, 69; *Greene* v. *Tyler & Co.,* 39 Penn. St. 361, 367; *Carolina Sav. Bank* v. *Parrott,* 8 S. E. 199, 202; *Cowgill* v. *Jones,* [Mo. 1903], 73 S. W. 995.)

FRICK, J.

On October 15, 1913, the plaintiff commenced this action against the defendant to recover certain sums of money which, the plaintiff alleged, he had paid to the defendant as principal and interest upon two contracts alleged to be usurious and which are hereinafter set forth. Two causes of action, one upon each of the contracts were stated in the complaint. The defendant appeared in the action, and in his answer, after admitting the matters of inducement, denied generally the other allegations of the complaint.

The action was based upon Comp. Laws 1907, sections 1241x, 1241x1, 1241x2. Section 1241x, in substance, provides that parties may enter into a contract "for the payment of interest, for the loan or forbearance of any money, goods, or things in action, not to exceed twelve per cent. per annum." Section 1241x1, as amended by Laws Utah 1909, p. 180, prohibits the taking of "any greater sum or greater value for the loan or forbearance of any money, goods, or things in action than is prescribed in section 1241x"; and any violation of the statute is declared a misdemeanor, and is punishable as such. Section 1241x2, so far as material here, reads as follows:

"Every person who, for any such loan or forbearance, shall pay or deliver any sum or value (greater) than is above allowed to be received, or the principal or any part thereof of said usurious loan or forbearance, and his personal representatives, may recover in an action against the person who shall have taken or received the same, and his personal representative, the amount of money so paid or value delivered, both

as principal and interest, if such action be brought within one year after such payment or delivery."

There are several other sections in which all notes, bonds, mortgages, etc., wherein more than twelve per cent. interest per annum is reserved are declared void.

The contract declared on in the first cause of action reads as follows:

"Salt Lake City, Utah, *Nov. 29, 1911.*

"I, *E. A. Hartenstein,* seller, have this day sold to *R. K. Cobb & Co.,* buyer *fourteen thousand (14,000)* shares of the capital stock of the *Pioche Demijohn* Mining Company, at *ten and one-half cents (10½).* per share buyer *sixty (60)* days, such sale being in accordance with the rules and by-laws of the Salt Lake Stock and Mining Exchange, the same being hereby referred to and made part of this contract. The said seller has deposited in escrow with *E. A. Hartenstein* said *fourteen thousand (14,000)* shares of stock and hereby acknowledges the receipt of *four hundred forty-one no/100* dollars *($441.00)* from the said buyer, being thirty per cent. (30 per cent.) margin required, and the said buyer hereby agrees to remargin as required by said rules and by-laws. In case of an advance in the price of said stock, any surplus margin over thirty per cent., shall upon demand of said buyer, be returned to him by said seller in like installments as they were made. The said *E. A. Hartenstein* is hereby authorized to deliver said stock to said buyer at any time with *sixty* days from date hereof, upon payment to him of amount due thereon.

Amount paid ................................$  *441.00*
Balance due ................................$*1,029.00*
   Total ..................................$*1,470.00*
   "[Signed]             *E. A. Hartenstein,* Seller.
                    *"R. K. Cobb & Co.,* Buyer."

The one on which the second cause of action is based reads as follows:

"Salt Lake City, Utah, *June 3d, 1912.*

"I, *E. A. Hartenstein,* seller, have this day sold to *R. K. Cobb & Co.,* buyer, *five thousand (5,000)* shares of the capital stock of the *Pioche Demijohn* Mining Company at *ten and*

*one-fourts cents* (*10¼*) per share buyer *thirty* (*30*) days,
such sale being in accordance with the rules and by-laws of
the Salt Lake Stock and Mining Exchange, the same being
hereby referred to and made part of this contract.   The said
seller has deposited in escrow with *E. A. Hartenstein* said
*five thousand* (*5,000*) shares of stock, and hereby acknowl-
edges the receipt of *one hundred fifty-three* 75/100 dollars
(*$153.75*) from the said buyer, being thirty per cent. (30 per
cent.) margin required, and the said buyer hereby agrees to
remargin as required by said rules and by-laws.   In case of
advance in the price of said stock, any surplus margin over·
thirty per cent. shall upon demand of said buyer be returned to
him by said seller in like installments as they were made.
The said *E. A. Hartenstein* is hereby authorized to deliver
said stock to said buyer at any time within *thirty* days from
date hereof, upon payment to him of amount due thereon.   ·
Amount paid .............................\...... $153.75
Balance due .......................................$358.75
     Total .........................................$512.50
   "[Signed]            *E. A. Hartenstein,* Seller.
                      "*R. K. Cobb & Co.,* Buyer."

Those portions italicized were written in the contracts with
pen and ink, while the other portions were printed matter.
There were several extensions of time indorsed on the backs of
both of said contracts, but those may be passed by for the
present.   There is also another writing which, it is contended,
is material in determining the question at issue to which we
shall refer again later.

In the first cause of action the purpose for which the con-
tract was entered into was characterized as follows:

"That the agreement described in the preceding para-
graph was disguised, and an attempt was made to conceal the
usurious nature thereof by a certain pretended contract of
sale dated November 29, 1911, signed by and entered into be-
tween said firm of R. K. Cobb & Co. and said defendant and
known as a 'buyer sixty,' wherein and whereby said defend-
ant pretended to sell to said firm of R. K. Cobb & Co. on a
margin, and said firm of R. K. Cobb & Co. pretended to buy
on a margin from said defendant, 14,000 shares of the capital

stock of the Pioche Demijohn Mining Company, at the rate of 10½ cents per share, aggregating $1,470 (notwithstanding said stock then and there belonged to said firm of R. K. Cobb & Co., and was, in fact, received from them by defendant as collateral security for the payment of the above described loan of $959), and wherein and whereby defendant also pretended to have received a margin of $441, or 30 per cent. of said sum of $1,470 (leaving a balance of $1,029 due on said alleged contract, which balance embraced the sums of $959 principal and $70 interest of the loan above described), whereas, in truth and in fact, instead of being the payment of a margin, the payment of said $441 was made as part of a scheme for the concealment of the true contract between said parties, and in the manner following to wit: At the time of said loan said defendant paid to said firm of R. K. Cobb & Co., the sum of $1,400, being $441 more than was actually loaned or borrowed, and concurrently with such payment said firm of R. K. Cobb & Co. returned to defendant said sum of $441, which was thereupon credited upon said pretended contract as 'margin,' as aforesaid. That said pretended contract was and is void, and was devised and intended as a mere cloak for the concealment of the true contract between said parties, which said true contract is set forth and described in the paragraph next above.''

Respecting the second contract similar allegations were contained in the second cause of action. It was also alleged that the transactions represented a loan of money, and that the plaintiff had paid to the defendant excessive sums of money as interest on said loan, and had also paid him the principal amount specified in the contracts. Judgment was prayed for the full amount stated in each cause of action. A trial to the court resulted in findings that the transactions described as aforesaid constituted loans from the defendant to the plaintiff; that the same were usurious, in that the amount paid to the defendant as principal and interest exceeded the amount permitted by the statute aforesaid; and that the contracts were entered into as a cloak or cover for usury. Upon those findings the court made conclusions of law and entered judgment for the whole amount prayed for in favor of the plaintiff, from which the defendant appeals.

The action was brought by the plaintiff as the surviving partner of R. K. Cobb & Co., a partnership composed of John A. Kirby and R. K. Cobb, who were engaged in the business of stock brokers in Salt Lake City under the firm name of R. K. Cobb & Co.; and the contracts, as appears on the face thereof, were made with and for the benefit of said firm. John A. Kirby died before the action was commenced, and R. K. Cobb sued as the surviving partner of said firm. Defendant's counsel now contend that, under section 1241x2, *supra*, the action should have been planted and prosecuted by the "personal representatives" of said Kirby, and that R. K. Cobb has not legal capacity to sue under that statute. Counsel, in effect, insist that the "personal representative" mentioned in the statute means the administrator or executor of a deceased person, and not a surviving partner. We cannot yield assent to the proposition. It is now universally conceded that in case a partnership is dissolved by the death of one of the partners the firm's business affairs are all to be settled by the surviving partner, and not by the administrator or executor of the deceased one. Our statute (Comp. Laws 1907, section 3918) expressly so provides. If the defendant is liable at all, such liability grows out of the transactions described in the contracts made with the firm of R. K. Cobb & Co., and hence in case of the death of one member of the firm the surviving member may enforce the liability.

Moreover, no objection was made at the proper time and in the proper manner to plaintiff's capacity to sue either by demurrer or answer, and therefore, if there had been any merit to this contention, it was waived. Comp. Laws 1907, sections 2966, 2967. See, also, *Insurance Co.* v. *Railroad Co.*, 44 Utah, 26, 137 Pac. 653, where the subject is discussed. For the reasons stated, this contention must therefore fail.

Defendant's principal assignment however, relates to the finding, or conclusion rather, of the district court that, in view of the facts and circumstances, the transactions in question were usurious, within the purview of our statute. While there are other questions presented by the assignments to

which we shall refer later, yet, as we view it, the assignment just referred to presents the real, as well as the difficult, question in the case. It is not disputed—indeed, it is conceded upon all sides—that the plaintiff and defendant were both stock brokers, members of the Salt Lake Stock and Mining Exchange, and were thus engaged in selling and buying stocks on commission and on personal account; that the defendant was not engaged in the money lending business either directly or indirectly, although he had made a loan or two, but such loans were made and evidenced ·in the regular way; that is, by evidencing the transaction by promissory note in which the rate of interest reserved was stated. The defendant, had, however, never made any loans to the plaintiff or to the firm of which he was a member. It was also conceded that the contracts in question were written on the regular stock exchange form which had been adopted and used by the members of the Salt Lake Stock and Mining Exchange for many years prior to 1911.

It is wholly impractical to set forth even the substance of the large mass of evidence which was produced at the trial by both sides. There are, however, some controlling features to which we shall specially refer. Before doing that, however, it is deemed best to refer to some of the leading authorities respecting what constitutes usury, so that we may obtain a clearer conception of the law upon that subject and to better enable us to apply the particular features of this case to the law.

First, what is the rule with regard to the construction that should be adopted in determining whether a given contract or transaction is usurious? The law upon that subject is clearly stated in 39 Cyc. 917, in the following words:

"Since usury laws are *quasi penal*, the court will not hold 'a contract to be in violation of the usury laws, unless upon a fair and reasonable construction of all of its terms, in view of the dealings of the parties, it is manifest that the intent of the parties was to engage in such a transaction, as is forbidden by those laws. If two reasonable constructions are possible, by one of which the contract will be legal and valid, while by the other it will be usurious and invalid, the court will always adopt the former. In short, the gen-

eral rule of interpretation and construction of such contracts may be said to be that the contract is not usurious when it may be explained on any other hypothesis."

Upon the question of the time that the character of the contract or transaction must be shown to be tainted with usury is well stated on page 918 thus:          4

"The character of a contract with respect to usury is determined as of the time it is made. If it is then legal, it cannot be rendered usurious by subsequent transactions, which, although themselves illegal and forbidden by law, cannot impart the taint of usury to an antecedent honest and legal agreement. This rule of construction finds-its most frequent application in those numerous cases in which it is held that, when a person agrees to pay a sum of money by certain date, and thereafter more than the legal rate of interest if the debt be not punctually paid, such an agreement is not usurious, even though excessive payments actually made under the agreement may be usurious."

After stating the law to be that if, upon the whole transaction, it is apparent that there was a corrupt or unlawful intent to violate the usury law, courts will permit no scheme or device to hide or cover it, the law          5, 6
upon what constitutes the prerequisites to establish usury is stated in the following language:

"In deciding whether any given transaction is usurious or not, the courts will disregard the form which it may take, and look only to the substance of the transaction in order to determine whether all the requisites of usury are present. These requisites are: (1) An unlawful intent; (2)) the subject-matter must be money or money's equivalent; (3) a loan or forbearance; (4) the sum loaned must be absolutely, not contingently, repayable; and (5) there must be an exaction for the use of the loan of something in excess of what is allowed by law. If all these requisites are found to be present, the transaction will be condemned as usurious, whatever form it may assume and despite any disguise it may wear. But if any one of these requisites is lacking, the transaction is not usurious, although it may bear the outward marks of usury."

It is further stated that the offense of usury is not complete unless there is an unlawful intent to violate the usury statute; and it is further stated that the intent may be inferred from the transaction or contract.

We are firmly committed to the doctrine as the same is stated in Cyc., in so far at least as the same relates to a corrupt

or unlawful intent and with respect to the elements which must be shown in order to establish usury. See the recent case of *Fisher* v. *Adamson*, 46 Utah, ——, 151 Pac. 351. The authorities are not uniform, however, as to whether the unlawful intent must be entertained by both the borrower and the lender or only by the lender. There are quite a number of authorities to the effect that it is sufficient if the lender entertains the unlawful intent to violate the statue, and his intent may, ordinarily, be inferred from the contract or transaction, when viewed in the light of all the surrounding circumstances. It is contended by some writers that reason and justice support the latter view. See Webb on Usury, Section 39. After stating that an "unlawful intent is essential," and after reviewing the authorities respecting the mutuality of such intent, the author of Webb on Usury, in said Section 39, proceeds:

"In no case, however, would a borrower be heard to complain of excessive interest contracted for or taken with the knowledge of the borrower only. If he were allowed to set up his own secret intent to evade the usury law and to give to the transaction a character different from what the other party supposed and intended it to be, and 'thus be enabled to avoid his own engagements, he would be taking advantage of his own wrong.' "

Referring now to some of the decided cases, it will be seen that the text quoted from Cyc. is amply sustained by the most respectable courts of this country.

In *Gillette* v. *Ballard*, 25 N. J. Eq. 491, it is said:

"Usury will not be inferred when the opposite conclusion can be reasonably and fairly arrived at."

Further:

"To sustain such a defense it must be shown that there was a usurious agreement."

In discussing the subject, the Supreme Court of Kansas, in *Lusk* v. *Smith*, 71 Kan. 556, 81 Pac. 175, says:

"Again, the existence of a usurious contract is never presumed. Where an agreement to pay interest is subject to two constructions, one of which would make it usurious, and the other not, the court will adopt the latter. * * * The burden is upon the party seeking to impeach the transaction *to show guilty intent, and that the contract was a cover for usury.*"  (Italics ours.)

In *Bank* v. *Waggener*, 9 Pet. at page 339, 9 L. Ed. 163, Mr. Justice Story, in referring to the usury statutes of Kentucky, and in discussing the usury laws generally, says:

"But before proceeding to consider them (the statutes) severally, it may be proper to remark that, in construing the usury laws, the uniform construction in England has been (and it is equally applicable' here) that, to constitute usury within the prohibitions of the law, there must be an intention knowingly to contract for or to take usurious interest; for, if neither party intend it, but act *bona fide* and innocently, the law will not infer a corrupt agreement."

The justice then proceeds to say that, where a contract "upon its very face imports usury," the intent is self-evident. Where, however, the contract or transaction in question is not of that character, and it is, nevertheless, claimed to be usurious, then, the justice says:

"It must be proved that there was some corrupt agreement or device, or shift, to cqver usury, *and that it was in the full contemplation of the parties.*" (Italics ours.)

The foregoing quotation is approved by the same court in *Call* v. *Palmer,* 116 U. S. 101, 6 Sup. Ct. 301, 29 L. Ed. 559, but the case from which the quotation is taken is erroneously stated to be reported in 14 Peters. *Orvis* v. *Curtiss,* 157 N. Y. 657, 52 N. E. 690, 68 Am. St. Rep. 810, is a case in which there was a stock transaction between stock brokers. It was there claimed that the transaction was, in fact, a shift or cover for usury. The New York Court of Appeals, in 157 N. Y. at page 661, 52 N. E. at page 691, in defining what constitutes a usurious transaction, lays down the following rule:

"There must exist, in fact or in law, a corrupt purpose or intent on the part of the person who takes the security to secure an illegal rate of interest for the loan or forbearance of money. There must be a lender and a borrower, *and it must appear that the real purpose of the negotiations and transactions was, on the one side, to loan money at usurious interest reserved in some form by the contract, and, on the other side, to borrow upon the usurious terms dictated by the lender.* These principles governing the law of usury are so well settled that it is unnecessary to cite authorities in support of them." (Italics ours.)

While, as we have seen, there is a diversity of opinion upon the proposition whether both the borrower and the lender

must joint in the corrupt purpore or intent, yet the authorities are all agreed that it must be clearly shown that at least the lender entertained a corrupt or unlawful intent to violate the usury statute. For the purpose of this decision, however, as we shall make clear hereafter, it will not be necessary to go to the extent of holding that both must join in such an intent.

In *Wood* v. *Babbitt,* 149 Fed., after determining what must be proved to establish a usurious contract or transaction, at page 822, it is said:

"It is not enough that the circumstances proved render it highly probable that there is a corrupt bargain; such a bargain must be proved, and not left to conjecture."

The same language is used by the Court of Chancery of New Jersey in *Berdan* v. *Trustees, etc.,* 47 N. J. Eq. 3, 21 Atl. 40. *Jackson* v. *Travis,* 42 Minn. 438, 44 N. W. 316, is to the same effect, though in Minnesota the doctrine prevails that it is sufficient if the lender entertains a corrupt or unlawful intent to violate the usury law.

The courts also differ with respect to the quantum of proof that is required; some holding that the proof should be beyond a reasonable doubt. Under our statute the taking or receiving of a greater sum of money, or goods, or things in action of greater value than permitted by the statute for a loan or forbearance of money constitutes, as we have seen, a misdemeanor and is punishable as such. In order to convict under the statute upon a criminal charge, no doubt, proof beyond a reasonable doubt would be required. Where the action, however, merely involves a civil liability, we thing that proof beyond a reasonable doubt is not required; but the evidence must, nevertheless, be strong, clear and convincing; that is, it must be of such a character as to convince the understanding and satisfy the judgment of the court or jury. See *Culmer, etc., Co.* v. *Gleason,* 42 Utah 344, 130 Pac. 66; *Brown* v. *Johnson,* 43 Utah 1, 134 Pac. 590, 46 L. R. A. (N. S.) 1157; *Fisher* v. *Adamson,* 46 Utah 1, 151 Pac. 351.

If the facts concerning the transaction in question as they are obtained from the testimony of the parties thereto are

now applied to the law as it is stated above, what conclusion must necessarily follow? Quoting from the original bill of exceptions, the plaintiff's version of the transac-    8 tion of November 29, 1911, is as follows: Counsel for the defendant, in referring to that contract, asked the plaintiff the following questions, to which he made the subjoined answers:

"Q. Just where it lies there now, doesn't it evidence just such a contract—just such a transaction as is daily entered into on the Stock Exchange? A. It might; yes. Q. Does it not? A. It does, but it wouldn't—but it wasn't that kind of a contract. Q. But on its face it does, does it not? A. On its face it does. Q. Yes; and that is true also of the other contract or transaction set out in the complaint under date of June 3, 1912, on the face of the contract it evidences just such a transaction as is of daily occurrence in the regular session of the Stock Exchange, is it not? A. They use the same paper; yes; they use the same contract? Q. Yes, you say? A. Yes. Q. Have you stated all of the conversation that you had that you can recall as having had with the defendant Hertenstein prior to the execution of the contract of November 29, 1911? A. Yes; I think so, Judge. Q. I wish you would give it to us again. A. Which conversation do you want, Judge? A. All conversations you had with the defendant, Hartenstein, about any business transaction, stock transactions, up to and including the time when the contract was signed on the 29th of November, 1911. A. Well, a few days before November 29th, a day or two before, Mr. Hartenstein came to me— Q. Where? A. On the floor of the Stock Exchange? Q. Go ahead. A. And he said to me, 'Why don't you give me some of your business?' He says, 'I have got some money.' 'Well,' I said, 'I guess I can; I can—' Q. Go ahead. A. 'I can use about $1,000 on Demijohn now.' He says, 'That will be all right.' I says, 'I will see you about it a little later.' The next day or the day after I met him on the floor of the Exchange again, and I said, 'I can fix up that Demijohn matter now if you want to,' and he came into my office, and he said, 'What do you want to do?' I said, 'I want to get about $1,000 on Demi-

john. I will put up 14,000 shares at 10 cents. I think that will be enough security.' And he said, 'I guess that will be all right; all I want is to be secured;' and I asked him what the rate would be, and he said, 'Half a cent, buyers 60.' Q. Which is the regular increment on 10-cent stock? A. Yes, sir. Q. Under the rules of the Exchange? A. Yes, sir.''

His version of the second transaction is not materially different. The plaintiff also, in substance, testified that, when the transaction in question was entered into, he did not know there was a usury statute in force in Utah; that he did not have in mind any usury law, and did not intend to violate any statute. It was also shown that the transactions were not carried on plaintiff's books as a loan, but were entered as a regular stock transaction. His counsel, however, insist that it was so carried for convenience merely; yet the fact that it was carried as a stock transaction on the books remains.

Referring now to the defendant's testimony respecting his understanding, he testified:

''Q. Referring to the spreads in your book, I will ask you to examine your book and to say whether there is in that book any spread save with Cobb & Co. where the amount of the spread was other than the amount fixed by the rules of the Exchange? A. We have no rules of the Exchange, fixed [fixing] amounts. Q. Don't your rules define the increment or spread? A. That is bids and offers. * * * Q. You did depart from the spread, as defined in your rules, with Cobb & Co., didn't you? A. No; we have no rules on the spreads. Q. Well, the rule as to bids and offers? A. Well, that is different. Q. Your rule as to bids and offers provides, where the stock is 10 cents, an increment of one-half a cent? A. Yes, sir. Q. Now, in your contract with Cobb & Co. of June 3d you made it one-quarter of a cent for 30 days, didn't you? A. Mutually agreed between he and I. * * * Q. When you entered into one of these contracts or any one of them, with Mr. Cobb—we will take the first one, of November 29, 1911—you may state whether or no you understood that you had to hold that stock for the 60 days, subject to

Mr. Cobb's call. A. Yes, sir. Q. No matter how much the stock might advance, did you understand you were at liberty to sell it? A. No, sir; I didn't. I understand that Mr. Cobb had the right under that contract to call for his stock and payment of it at any time during the 60 days, and thereby take advantage of any advance there might be in the mar-ket. * * * Q. Mr. Hartenstein, in making any of these contracts that you did make with Cobb, these spread contracts which have been alluded to in the testimony, I will ask you what your intention was and what your understanding was in entering into those contracts severally; was it your intent and understanding that you were making a loan, or that you were making a spread contract? A. My understanding has been always when I made a spread that that was my profit; when I made these spreads that was my fair—my profit."

The contract entered into by plaintiff and defendant were also fully explained by the stock brokers and members of the Salt Lake Stock and Mining Exchange. A precise and clear idea respecting their testimony can perhaps best be gleaned from plaintiff's counsel's brief. It is there said:

"There was assembled at the trial of this case, as witnesses for the defendant, nearly all of the brokers of the Stock Exchange. With the regularity and unanimity of an Anna Held ballet, these benighted individuals were called and testified that they had never heard of buyer 30 contracts covering loans, and could not conceive of money borrowed upon such contracts. Yet at the time of Cobb's failure—at a time when they had no possible object in concealing the real transactions—almost every last broker termed these transactions 'contracts covering loans.' "

The "contracts covering loans" referred to by counsel is as follows:

"Salt Lake City, Utah, Jan. 18, 1913.

"In consideration of amounts written below, which are margins on the various accounts, the undersigned creditors of R. K. Cobb & Co. hereby promise and agree to extend time of payments on their notes and contracts covering loans on Prince Consolidated stock until April 1, 1913, and to hold

intact such stock subject to their demand as per number of shares below upon payment in full for the whole or any part thereof, provided said R. K. Cobb & Co. shall pay a further margin of ten (10) cents per share should the stock depreciate to ninety (90) cents per share.''

Then follow the number of shares held by each broker and their names. This is the other writing to which we referred before in this opinion.

The plaintiff, like the defendant, however, also testified that at the time of the transactions in question he did not know there was a usury law in force in the State of Utah and had no intention of violating any law. There is a vast amount of testimony pro and con. We cannot give even the substance of more here. Neither is it necessary to do that, since we have neither the power nor the disposition to analyze or weigh the evidence. All that we have the power to do, and all that we purpose doing, is to take plaintiff's version of the transactions, and from his statements and from the circumstances surrounding him and the defendant at the time of the transactions, when considered in connection with the inferences that may be deduced from the whole evidence in favor of the plaintiff, determine whether there is any substantial evidence upon every element that is necessary to stamp the transactions in question as usurious and in violation of our usury statute. In view, however, that the usurious character of the transactions in question must be established otherwise than from the face of the contracts, it becomes necessary to consider the defendant's testimony relating to his intention in connection with plaintiff's testimony in order to determine the true nature or character of the transactions. While defendant's testimony may not be conclusive, yet where, as here, no evidence respecting his intentions is in the record, except the inference that may be deduced from the fact that he was paid a larger sum of money than is permitted by our usury statute, his testimony upon that subject may at least weaken the inference, if it does not entirely dissipate it.

By the foregoing statement we do not mean that defendant's testimony can be considered for the purpose of comparing it with plaintiff's testimony or to weigh one against the

other, but what we mean is that it must be considered for
the sole purpose of determining whether from his testimony
upon the question of his intention, considered in the light
of plaintiff's testimony and in view of all the circumstances,
there is any substantial evidence justifying a finding, or con-
clusion rather, that the defendant had a corrupt motive or
intention to violate the usury law at the time he entered into
the contracts or transactions in question. As we have seen,
by the statement of the law quoted from Cyc. which we have
adopted in *Fisher* v. *Adamson, supra,* in order to establish
usury, the existence of an unlawful or corrupt purpose is
one of the essential elements which must be clearly proved
to exist at the time the contract or transaction which is
claimed to be usurious is entered into. Where the contract
upon its face is usurious, the intention may be inferred, and
the inference may be so strong that no express denial can
avoid the same. Where, however, as here, the contract is a
legitimate one, and is one that is frequently used by stock-
brokers, but it is nevertheless contended that it is a mere
shift, cloak, or cover for usury, then it requires substantial
evidence of a corrupt or unlawful intent, or some fact or facts
from which such an intention may be clearly inferred. Plain-
tiff's counsel concede, as all who are familiar with this record
must concede, that there is no evidence whatever which jus-
tifies the allegations of the complaint that the plaintiff and
the defendant adopted the form of contract in question in
order to hide or cover up the true character of the transac-
tion. In view that it is not disputed that neither the plain-
tiff nor the defendant had any knowledge that there was a
usury law in force in the State of Utah, it is quite impossi-
ble to conceive that they should have selected the form of
contract in order to avoid what, so far as they knew, had no
existence. It is quite unbelievable that men enter into a
sham arrangement for the purpose of avoiding something of
which they possess no knowledge. Then, again, the contract
was one that had been in regular use by the stock brokers for
many years, and such contracts were frequently, if not daily,
entered into between stock brokers. In addition to all that,
all of the stock brokers testified, and the plaintiff does not

dispute it, that the contracts were not regarded as loan contracts, and were not used for that purpose. How, then, can it be reasonably inferred that the contracts were entered into as a shift or cloak to cover usury? While, no doubt, such a contract could be used as a cover for usury, yet there is nothing tangible in the evidence upon which to base a conclusion that the contract was used for that purpose in this instance. We are not unmindful of the arguments and contentions made by plaintiff's counsel that after the contracts were entered into many circumstances arose from which one might deduce an inference that there was a corrupt or unlawful motive. In view of the foregoing, counsel contend that there is some substantial evidence justifying a finding of a corrupt or unlawful intent on the part of the defendant. Their deductions are, however, principally drawn from facts and incidents which occurred long after the contracts were entered into and the transactions had been fully consummated. · The law is, that usury must exist in the original transaction and the unlawful intent must be found to have existed at the time the transaction was entered into. Further, if two inferences may fairly be deduced from a given transaction, one that it is lawful and the other that it is not, the law requires the court or jury to follow the former and to disregard the latter inference. Counsel, however, further contend that, in view that the trial court has found the transactions to be usurious, which finding, they insist, is based upon evidence some of which is in conflict, we are powerless to review such finding, since we cannot pass upon the weight of the evidence. In arguing that contention, and much space is devoted thereto in their brief, counsel simply assume that, because there is a conflict upon some phases of the case, therefore there is a conflict upon all phases. They further assume that, because there is· some substantial evidence in support of some of the essential elements, therefore there is such evidence in support of all the elements. Moreover, they assume that, because the court or jury has found that there is some substantial evidence in support of all the elements constituting a right of action, therefore this court is powerless to review the findings.

That is not the law, where a cause of action or a right to recover in a civil action depends upon a number of elements, then, unless there is some substantial evidence in support of every one or those elements, the general verdict or conclusion which assumes such elements to exist **9, 10, 11** must fail. That doctrine has so often been applied and illustrated by this court that we shall do no more than to refer to the later decisions where it is applied. *State* v. *Hill,* 44 Utah 79, 138 Pac. 1149; *State* v. *Blank,* 43 Utah 211, 134 Pac. 735; *State* v. *Potello,* 40 Utah 56, 119 Pac. 1023; *State* v. *Powell,* 45 Utah 193, 143 Pac. 588; *State* v. *Sheffield,* 45 Utah 426, 146 Pac. 306. The same rules apply in civil cases; the only difference being that courts, as a rule, are more reluctant to interfere in civil than in criminal cases, where liberty and sometimes even life is involved. In a very recent case, *Blackburn, Adm'r,* v. *Baker,* 47 Utah ———, 152 Pac. 1184, the doctrine is applied in a civil case by this court. There the question was whether the defendant had assumed personal liability or whether he had acted in a representative capacity. We there held that there was no evidence justifying a finding, or conclusion rather, that the defendant had assumed personal responsibility, but that he had acted in a representative capacity, although the court had found to the contrary. This court is quite as capable of determining whether there is any substantial evidence upon a particular element as is the trial court or jury, and in doing that we in no way impinge upon or usurp the functions or the province of the triers of fact. Again, where the ultimate question to be solved is one of law, or one of mixed law and fact—that is, where the facts are found or are not in dispute—this court must determine the ultimate question one way or the other. To illustrate: Where there is nothing before the court except the contract which is alleged to be usurious, the question of whether the contract is usurious or not is purely one of law. Where, however, as here, the contract or transaction is not upon its face usurious, then it is a mixed question of law and fact. The facts being for the jury, when those facts are found, then the court determines the ultimate question of whether the contract or transaction is

usurious or not. This may be done by choosing one of two alternatives: (1) By instructing the jury hypothetically directing them as to what their conclusion shall be in case they find the facts to be in a particular way; or (2) by merely directing the jury to find the facts, and the court will apply the law thereto as found. But, as we have already pointed out, where a defense or a complete right of action depends upon divers elements, it is the duty of every reviewing court, when proper assignments are made and insisted upon, to scrutinize the evidence, and from it determine whether there is some substantial evidence in support of every essential element. In doing that the court is neither weighing the evidence nor passing upon the credibility of the witnesses, but is merely discharging the duty imposed upon it by law. Of course, the easy thing to do would be to follow the findings of the trial court or jury, whatever they may be. If we merely consulted our own inclinations, and if we recognized no higher duty than to follow the course of least resistance, we should in every case abide by the findings of the lower courts or juries. Whenever, in our judgment, there is some substantial evidence, either direct or inferential, in support of every element which is necessary to sustain the judgment, and there are no errors of law, we unhesitatingly affirm the judgment. We, however, should as unhesitatingly refuse to affirm where, in our judgment, there is no substantial evidence in support of one or more essential elements constituting the cause of action. While upon questions of fact we may not substitute our judgment for that of the jury or trial court, yet upon the question of whether there is any substantial evidence in support of a particular fact or element we may not permit the trial court or jury to substitute their judgment for ours. In arriving at a conclusion in that regard we must, as a matter of course, abide by our own judgment and understanding. In this case we have had much aid from the briefs of counsel on both sides, in which they have fully given us their views regarding the law and the evidence. Appellant has filed three printed briefs, covering 226 pages, while respondent's counsel have filed two, covering 118 pages. Every phase of the case has been exhaustively briefed and

argued, and we have aimed to give the case that considera-
tion which its importance merits. We have been unable, how-
ever, to make our judgment conform to that of the trial court.
We are thoroughly convinced that it was neither the purpose
nor the intention of either the plaintiff or the defendant to
avoid or violate the usury law of this state. We are equally
well satisfied that the plaintiff did, in fact, pay more than
the amount of interest permitted by our statute, but that is
not enough to make the transactions usurious and to author-
ize a court to take from the defendant both principal and
interest and give it to the plaintiff. Let it also be conceded
that the transactions constitued a loan from the defendant
to the plaintiff, yet, when that fact is conceded, the corrupt or
unlawful intent to evade the law is still wholly lacking. The
mere fact that one may pay to another an excessive rate of
interest pursuant to a contract is not always sufficient to au-
thorize a finding of usury. If that were so, every contract
upon which more than the amount permitted by the statute
were paid would be usurious regardless of the intention of
either the borrower or the lender. If that were the law, inten-
tion would cease to be an element in the law of usury. In or-
der to constitute usury, as Mr. Justice Story puts it, ''there
must be a corrupt agreement,'' in addition to the payment
of an excessive rate of interest. There is—there can be—no
escape from that conclusion. In our judgment, the trial
court was too greatly influenced by the fact that the plaintiff
did, in fact, pay to the defendant more than the amount per-
mitted by our statute. After that fact was found the court
seemingly deduced every inference against the legality of
the transactions. No other conclusion is permissible. That
view, as we have seen, is wholly repudiated by the courts.
This case, therefore, affords another instance where too much
stress is laid upon *ex post facto* acts and conduct. That is a
rock upon which the findings and judgments of the trial
courts are frequently shattered. To affirm the judgment in
this case would, to our minds, not vindicate the law, but
would inflict a penalty where no wrong was intended. The
parties concerned were engaged in a highly speculative busi-
ness, verging on to what by some is termed mere ''gambling.''

The term "gambling" is here not used in an offensive sense, but merely as illustrating that the dealing in stocks and futures is of a highly speculative character. . The parties met at arm's length. Both of them seemingly understood just what they were doing and what the effect of their conduct was according to the rules of the Stock Exchange. Each seemed to realize that it might result in paying or receiving a profit in excess of 12 per cent., but neither seemed to intend the transaction as a cloak or cover for usury; nor did either intend to violate any law, and hence at least one element which is necessary to make out the offense of usury is wholly lacking. To enforce a judgment under such circumstances would be to perpetrate a wrong, not to vindicate one.

In view that the judgment must be reversed, for the reasons stated, it becomes necessary for us to decide at least two other questions raised by defendant's counsel. It is contended that, under the provisions of Section 1241x2, nothing can be recovered except the excessive interest or the excessive value that has been paid or delivered. While the statute is not as clear as it might be, yet by giving all the language in the statute its ordinary force and effect, as we must, there seems little, if any, doubt that it was intended that the person who has paid money or has delivered "things in action" in excess of the rate fixed by the preceding sections may sue for and recover back both "principal and interest," if the action is brought within one year after the money is paid or the "things in action delivered." We confess that we are unable to give the language of the statute any other meaning.

It is next contended that, if Section 1241x2 is construed as we have just done, then it is void, for the reason that the title to the original act is not sufficiently broad to authorize the recovery of the principal sum paid as aforesaid; in other words, it is contended that the title is insufficient because it does not clearly express the subject of the act. We do not deem it necessary to devote much time to the discussion of that subject in view that in the last year or two we have frequently considered the provision of our Constitution relating to the titles of legislative acts and their sufficiency. See *Marioneaux* v. *Cutler*, 32 Utah 475, 91 Pac.

355; *Edler* v. *Edwards,* 34 Utah 13-19, 95 Pac. 367; *Naylor* v. *Crabbe,* 45 Utah 617, 148 Pac. 359; *Martineau* v. *Crabbe,* 46 Utah 327, 150 Pac. 301.   In our judgment, the objections urged against the act in question are covered by what is said in those cases upon the subject of the sufficiency of the title.   We think that this case falls squarely within the rule there laid down.

For the reasons stated, the judgment is reversed, and the cause is remanded to the District Court of Salt Lake County, with directions to grant a new trial and to dispose of the case in accordance with the views herein expressed.

We remark that in this case counsel for appellant have, in their several briefs, printed at least fifty pages of excerpts from the evidence which, in our judgment, was unnecessary, since the same evidence had already been printed in their abstract.   While counsel may repeat the evidence in some instances for their and for the convenience of the court, yet the adversary party should not be required to pay twice for printing the evidence.   It is therefore ordered that appellant's counsel deduct fifty pages from the 226 pages of their briefs in making up their cost bill, and it is further ordered that appellant recover no costs for said fifty pages; appellant to recover costs other than those just mentioned.

STRAUP, C. J., and McCARTY, J., concur.