[No. 10924. Department Two. February 6, 1914.]

WASHINGTON FIRE INSURANCE COMPANY *et al., Appellants,* v. MAPLE VALLEY LUMBER COMPANY *et al., Respondents.*[1]

USURY—ACTIONS—EVIDENCE—SUFFICIENCY—BONUS OR PROFITS ON RESALE. Under the rule that the burden of proving the defense of usury is upon the party alleging it and that it is necessary to establish an unlawful intent, the defense of usury, in an action to foreclose a mortgage for $25,000, is not established where it appears that the defendant was desirous of purchasing certain timber at $105,000, the owner's selling price, but was unable to raise any money, when it interested the plaintiff's president in the matter, who secured the loan of $25,000 from the plaintiff to enable the defendant to handle the matter, under an agreement that he would purchase the timber and resell it to the defendant at an advance of $20,000, represented by four notes for $5,000 each, which were to be paid without interest as the timber was cut, and which sum was conceded to him as his profit in the transaction, although, in consummating the deal, the deed to the timber was made direct to the defendants in order that deferred payments on the purchase price would not appear as liabilities of the plaintiff or its president; the testimony as to the final consummation of the deal indicating that the notes were intended as a profit on the resale and not as a commission or bonus for securing the $25,000 loan.

[1]Reported in 138 Pac. 553.

Appeal from a judgment of the superior court for King county, Dykeman, J., entered July 11, 1912, upon findings in favor of the defendants, upon an issue as to usury, in an action to foreclose a mortgage.   Reversed.

*Hughes, McMicken, Dovell & Ramsey,* for appellants Fireman's Fund Insurance Company *et al.*

*Alexander & Bundy,* for appellant Washington Fire Insurance Company.

*John W. Roberts (Million & Houser* and *Paul W. Houser,* of counsel), for respondents O. B. Woolley, Trustee, *et al.*

*Scott Calhoun,* for respondent Union Machinery & Supply Company.

MAIN, J.—The purpose of this action was to foreclose a mortgage.   The original parties were Washington Fire Insurance Company, a corporation, plaintiff, and Maple Valley Lumber Company, a corporation, Union Machinery & Supply Company, a corporation, J. F. Smith, and M. B. Keeney, defendants.   After the action had been begun, the Maple Valley Lumber Company was adjudged a bankrupt in the United States District court.   One O. B. Woolley was elected trustee in bankruptcy, and as such trustee became a party to this action by intervention.   The Fireman's Fund Insurance Company, a corporation, the Washington Trust and Savings Bank, a corporation, and W. H. Williams, also intervened.

The parties to this appeal, by stipulation, have provided that the appeal of the Union Machinery & Supply Company may be dismissed, and the judgment as to it affirmed. M. B. Keeney and W. H. Williams did not prosecute an appeal.   All the other parties have appealed as against the judgment entered in so far as it was adverse to their respective contentions.

The record is voluminous, and an attempt will only be

made to epitomize the facts so far as it may appear necessary for the understanding and decision of the questions presented. Taking about July 1, 1910, as the starting point, for some years prior to this time one D. Dierssen had been the owner of a large tract of timber land, on the east side of Lake Washington. At this time, the Maple Valley Lumber Company owned and operated a saw mill on the west side of the same body of water. For a period of three or four years, the lumber company, through its president, J. F. Smith, had from time to time negotiated with Dierssen for the purchase of the whole or a part of the tract of timber. On March 15, 1910, the lumber company made a proposition to purchase all the merchantable timber at three dollars per thousand stumpage. This proposition was declined by the owner of the timber, and further negotiations between them seem to have been abandoned.

Sometime during the month of July, one T. M. Tennent secured from Dierssen a ten day option upon the land and timber for the sum of $500,000. Shortly thereafter, Tennent and Dierssen approached Henry Carstens, who was the president of the Washington Fire Insurance Company and the owner of practically the entire capital stock of Carstens & Earles, Incorporated, with a view of interesting him in the purchase of the property. During this interview, it was made plain that Carstens would not be interested in anything other than the timber. Dierssen at this time made to him a price upon the timber only of $105,000.

Within a very few days thereafter, J. F. Smith was brought to Carstens' office by Tennent. At this time, Tennent stated that the timber which was subsequently the subject-matter of the contract had been cruised under his direction, and the total amount of merchantable timber was from 40 to 50 million feet; and also stated that he had offered Dierssen the sum of three dollars per thousand for the timber, and that he would be willing to pay a lump sum therefor of $125,000 or $130,000, providing he could borrow sufficient money

to meet certain of his pending obligations, and also enable him to open up the timber for logging.

From this time forward, Smith was repeatedly in Carstens' office discussing various propositions as to the handling of the timber, one of which, a proposed bond issue, was never consummated. Dierssen at various times sought out Carstens in an effort to dispose of the timber to him. Carstens stated to Dierssen on one occasion that he was not then prepared to purchase the timber, but that, if he subsequently determined to do so, they could do business upon the terms proposed.

The discussions between Carstens and Smith, on the one hand, and Carstens and Dierssen, on the other, continued until about November 1, 1910, at which time Carstens told Smith to go direct to Dierssen and contract for the timber. The contract was drawn on November 9th and executed on the 12th, in which the contract price of the timber was fixed at $105,000. At the time Smith was directed to purchase the timber direct, he stated to Carstens that he understood that Carstens was to purchase the timber himself, and then resell it to him (Smith). Carstens stated that he preferred the transaction to be between Smith or the Maple Valley Lumber Company and Dierssen direct; the reason for this being that he did not desire that the deferred payments should appear as a liability of himself or his company.

During the month of July or August, while the negotiations were pending, Carstens loaned to the lumber company some four or five thousand dollars. When it was determined to take over the timber, Carstens informed Smith that the Washington Fire Insurance Company would make a loan of $25,000 to the lumber company, secured by mortgage upon the property of the company. Abstracts were thereupon gotten out, and the title approved to the property offered as security. On November 16, 1910, Smith, and Brown, the secretary of the lumber company, came to Carstens' office and the transactions were there completed. The Maple Val-

ley Lumber Company and J. F. Smith executed to the Washington Fire Insurance Company their twenty-five promissory notes for $1,000 each, bearing interest at the rate of seven per cent per annum, and the Maple Valley Lumber Company also executed a real estate and chattel mortgage securing the notes. At the same time, the Maple Valley Lumber Company executed four promissory notes for $5,000 each to Henry Carstens, each of which except the first bore interest at six per cent per annum, payable on or before one, two, three, and four years after date, respectively. At this time, a written contract was entered into between the Maple Valley Lumber Company and Henry Carstens, setting forth the agreement or understanding between the parties relative to the transaction. This agreement was as follows:

"This contract recites that Henry Carstens having had an option or understanding with one Dierssen under which Dierssen was willing to accept $105,000 for a certain parcel of timber known as the 'Dierssen Timber' near Renton in King county, Washington:

"We, the Maple Valley Lumber Company, a corporation under the laws of Washington, having desired and attempted to purchase the same timber from Dierssen for the sum of $130,000; but having been unable so to do without financial assistance,

"Said Henry Carstens at our request intervened and by negotiating for us a loan enabled us to acquire the said timber at the price we were willing to pay for the same, namely, $130,000,

"Now, we, the Maple Valley Lumber Company, freely admit a profit to Henry Carstens in this transaction of $20,-000, fully justified by the valuable service rendered; and have this day executed to Henry Carstens our four promissory notes, bearing even date herewith, with interest at six per cent, except the first such note which bears no interest, each one of these notes being for $5,000, payable, the first, one year from this date and the remaining three notes at intervals of one year each.

"And to secure these notes we hereby stipulate, contract and agree that as we log the Dierssen timber we shall and will for every thousand feet of timber cut pay upon these

notes the sum of fifty cents; doing so monthly and furnishing to Henry Carstens monthly true and correct scale bills of the amount of logs cut by us, together with such other or further evidence of this kind as he, Henry Carstens, may require; but

"Regardless of the amount of timber so cut, the full amount of these notes, namely, $20,000, is the measure of our indebtedness to Henry Carstens, and nothing herein shall be construed as indicating or evidencing that these timber payments shall be the sole or only security for the said notes or anywise prevent or limit the collection of the same according to the terms of the notes themselves.

"It is voluntarily stipulated by Henry Carstens that if the entire series of notes be paid in full on or before two years from this date no interest upon any of the notes shall be charged against or be collected from the Maple Valley Lumber Company.

"This contract privileges and binds the legal heirs, executors or assigns of both parties hereto.

"Dated at Seattle this 16th day of November, 1910."

On November 30th, Carstens indorsed the four $5,000 notes, without recourse, and delivered them to the Washington Fire Insurance Company. Some two or three months subsequent to this, a portion of the lumber company's mill was destroyed by fire, and soon the company became financially embarrassed and, as already indicated, it became involved in bankruptcy proceedings in the Federal court.

The present action was begun on or about the 20th day of April, 1911, for the purpose of foreclosing the $25,000 mortgage. After issue had been joined between the various parties, the cause was tried to the court without a jury. Stated briefly, the trial court adjudged: First, that the transaction was an usurious one; second, that, inasmuch as three of the $5,000 notes were not then due, they could not be offset against the amount of the recovery; and third, that the Fireman's Fund Insurance Company was not a holder in due course.

The trial court made no findings of fact. Indeed, at the end of the judgment, it was provided that "none of the re-

citals in this decree are to be construed as findings of fact."
The recitals in the judgment supported the claim of usury,
but the court apparently refused to permit this to stand as
an affirmative finding to that effect. From this judgment,
the appeals are prosecuted.

The primary question is, whether the transaction between
Carstens and J. F. Smith representing the Maple Valley
Lumber Company, was subject to the taint of usury. ·

Rem. & Bal. Code, § 6251 (P. C. 263 § 3), provides, that
no person shall directly or indirectly take or receive any
greater interest than twelve per cent per annum for the loan
or forbearance of any money, goods or thing in action. Sec-
tion 6255 (P. C. 263 § 13) specifies the penalty that shall
be imposed where an action is brought upon a contract and
the proof establishes a greater rate of interest has been
charged than that provided for in the preceding section.

The respondent, Maple Valley Lumber Company, by af-
firmative defense, charged that the transaction was usurious.
Where the defense of usury is relied upon, the burden of prov-
ing the usurious character of the transaction is upon the
party alleging it. 29 Am. & Eng. Ency. Law (2d ed.), p.
541. In determining whether the particular transaction is
usurious, courts will disregard the form and look to the sub-
stance of the transaction. 39 Cyc. 918; *Cooper v. Nock,* 27
Ill. 301; *Lukens v. Hazlett,* 37 Minn. 441, 35 N. W. 265;
*Clemens v. Crane,* 234 Ill. 215, 84 N. E. 884.

One of the requisites necessary to establish usury is an un-
lawful intent, that is, that there was an intent to do those
things forbidden by the statute. It is not necessary that
there be an intent to violate the usury statute as such. The
law presumes the necessary unlawful intent from the mere
fact of intentionally doing what is forbidden by the statute.
39 Cyc. 919.

In *Clarke v. Sheehan,* 47 N. Y. 188, it is said:

"Usury consists of a corrupt agreement, whereby more
than lawful interest is to be paid; and all shifts and devices
which may be resorted to, for the purpose of covering up or

concealing such an agreement, are ineffectual, if the intent to obtain more than legal interest for the use of the money can be discovered. And even a mistake of law will not protect the lender. (2 Cow., 678). But, where no such intent exists, refined theories should not be resorted to, for the purpose of making out usury by construction."

In the present case, then, disregarding the form and looking to the substance of the transaction, if it were the intention that Carstens should purchase the timber from Dierssen and resell it at an advance of $20,000, making the selling price to the Maple Valley Lumber Company $125,000, then the transaction is not subject to the taint of usury. But if the fact be that the four $5,000 notes were intended as a commission or bonus on account of the $25,000 loan, the charge of usury must be sustained. The parties to the transaction, at the time of its consummation and apparently before there was any thought of difficulty arising out of it, executed the document referred to in the statement. That contract contains the following:

"Henry Carstens having had an option or understanding with one Dierssen under which Dierssen was willing to accept $105,000 for a certain parcel of timber known as the 'Dierssen timber' near Renton in King county, Washington,

"We, the Maple Valley Lumber Company, a corporation under the laws of Washington, having desired and attempted to purchase the same timber from Dierssen for the sum of $130,000; but having been unable so to do without financial assistance,

"Said Henry Carstens at our request intervened and by negotiating for us a loan enabled us to acquire the said timber at the price we were willing to pay for the same, namely, $130,000,

"Now, we, the Maple Valley Lumber Company, freely admit a profit to Henry Carstens in this transaction of $20,-000, fully justified by the valuable service rendered; . . ."

The following is an excerpt from the testimony of Dierssen and bears upon the character of the transaction:

"Q. When Carstens said to you that your price was satisfactory and that he would deal with you when he got ready,.

was, that the last negotiation you had with him? A. Yes, sir, he took my address and he says, 'I will let you know when I am ready, when times are better so I can make a turn.' He was willing to take my proposition, he was going to sell it to whoever he saw fit. Q. He was to get his compensation for the sale over the $105,000? A. Yes, that had nothing to do with me, I didn't care what he got, if he bought, he had to buy to sell it or operate it."

As bearing upon the question whether Smith or the Maple Valley Lumber Company purchased the property from Carstens, the latter testified as follows:

"Q. Now, the latter part of October what occurred as between you and Mr. Smith or the Maple Valley Lumber Company? A. On one of his visits to me I asked Mr. Smith,— he urged me to bring the matter to some conclusion stating among other things that Mr. Dierssen would soon go to California and that if he was to get the timber he would need to act soon. I asked him 'what was the least amount of money you can get along with and get yourself in shape?' He says, 'Twenty-five thousand dollars.' I says, 'If I can get you twenty-five thousand dollars, do you think you can open up this timber and make a success of the thing in your opinion?' He thought he could. I said, 'You can buy this timber of me for $125,000 and you can buy it at that figure and do well at it, can you?' He says, 'I will buy it and I can make $100,000 in cutting it out.' My interest was largely in the direction of not having it understated."

As shown by the facts stated, Smith, up until the time that Carstens told him to go and deal directly with Dierssen; understood that the title to the property was to be acquired by Carstens, and in turn sold and conveyed to the Maple Valley Lumber Company.

Considering all the facts and circumstances of the case, and especially the contract which the parties solemnly executed when the transaction was closed, the testimony of Dierssen relative to his dealings with Carstens and the testimony of Carstens as to how he disposed of the property, seem to make it sufficiently obvious that there was an intent on the part of Carstens to purchase the property and resell

it, and that the four $5,000 notes were given as a profit upon
this transaction, and not as a commission or bonus for the
$25,000 loan.   It is true that Dierssen testified that Cars-
tens had nothing to do with the sale of the property to Smith.
But Dierssen could not know of the negotiations between
Carstens and Smith, he not having been present.   It is also
true that Smith testified that Carstens had nothing to do with
the consummation of the sale between himself and the owner of
the property.   This witness also testified that the contract
above referred to, which was executed by the Maple Valley
Lumber Company, by him as president, and Brown as secre-
tary, was called to his attention at the last moment, and he
had no alternative but to sign.   His testimony is weakened,
however, by the fact that Brown, the secretary, testified that
Smith, some two weeks before, had told him that such an
agreement was to be made.

Upon the pivotal question as to the character of the trans-
action, the testimony of Carstens stands against that of
Smith, because they alone testify concerning material mat-
ters which occurred during the negotiations between them.
Considering the testimony of these two witnesses as it ap-
pears in the cold record, Carstens was the more candid and
the less evasive.   As already shown, the burden was upon the
lumber company to prove the charge of usury, and we think
it has failed to meet this burden.   It seems highly improbable
that Mr. Smith, a man who had been in the lumber business
for years, would undertake to pay $20,000 as a bonus or
commission for the purpose of securing a loan of $25,000.
It also seems improbable that a man of Mr. Carstens' appar-
ent sagacity and business ability would make a loan of $25,-
000 and exact as a bonus or commission a sum which would
make it impossible under the usury statute for him to re-
cover the major portion of the principal loaned.

As sustaining the charge of usury, a number of the pre-
vious decisions of this court have been cited.   A careful ex-
amination of all these cases discloses that none of them are

out of harmony with the views here expressed.   The case of
*Ridgway v. Davenport,* 37 Wash. 134, 79 Pac. 606, appears
to be the decision most relied upon.   In that case, the broker
loaned the money of his principal and deducted a sum as
commission which was in excess of the legal interest.   It was
held to constitute usury under the statute.   In the present
case, however, as already indicated, the four $5,000 notes were
not given as a bonus or commission, and therefore do not come
within the case of *Ridgway v. Davenport, supra.*   In the
recent case of *Testera v. Richardson, ante* p. 377, 137 Pac.
998, after citing and distinguishing the *Ridgway* case,
it was held that, where money was paid for the reasonable
value of services rendered in connection with a loan, the sum
so paid together with the interest would not constitute usury,
even though the sum paid for the services and the interest
charged in the note exceeded the statutory limit.   It was
there said:

"If the money paid by the appellants to J. W. Richardson
could be held to be unreasonable or in the nature of a com-
mission for making the loan, the case of *Ridgway v. Daven-
port, supra,* would control.   But we are satisfied, and the
court found, that the services were performed for the appel-
lants and were reasonably worth the amount which the appel-
lants agreed to and did pay, and the money paid was not for
a commission."

While the facts of that case differ from those of the pres-
ent, the principle which was there applied is the same as the
one which supports the present holding; that is, that if a
sum in excess of the statutory limit is paid as a commission
or bonus for a loan, then the transaction is subject to the
taint of usury; but if the sum so paid is for services rendered,
or for profits earned upon a transaction other than the mak-
ing of the loan, then the transaction is free from usury.
There are a number of other questions discussed in the briefs,
but what has already been said renders a consideration of
these unnecessary.

The judgment will be reversed, and the cause remanded with direction to the superior court to enter a judgment of foreclosure for the amount of the $25,000 loan, and interest thereon as specified, less all sums received as payment thereon. No costs will be allowed in this court.

Reversed.

CROW, C. J., ELLIS, FULLERTON, and MORRIS, JJ., concur.