ROSSBERG et al. v. HOLESAPPLE et al.

No. 7802.   Decided July 27, 1953.   (260 P. 2d 563.)

See 66 C.J. Usury, sec. 305. Usury, payment for lender's services as. 55 Am.Jur., Usury, sec. 62; 105 A.L.R. 795.

*John Farr Larson,* Salt Lake City, for appellants.

*Woodrow D. White,* Salt Lake City, for respondents.

WOLFE, Chief Justice.

Action by the appellants to foreclose certain security given by the respondents for the payment of a $1600 promissory note executed by them. The respondents denied liability on the ground that the note was usurious. From a judgment declaring the note and the security null, void and usurious and cancelling the same, this appeal is prosecuted.

The evidence is substantially without dispute. On April 11, 1951, the respondents, as buyers, and Jack H. and La-Von M. Rohlfing, as sellers, executed an "Earnest Money Receipt and Agreement" for the purchase and sale of a house in the southeastern section of Salt Lake City for the sum of $16,500. Mr. Rossberg, one of appellants, a salesman for the Christensen Realty Company, handled the sale. Respondents made a payment of $500 upon signing the agreement and agreed to pay an additional $2000 on delivery of a final contract of sale on or before April 20, 1951. The balance of the purchase price was to be paid in monthly installments. On April 20th, the respondents were unable to make the $2000 payment, having been unable to obtain the funds from relatives as planned, and the next day informed Mr. Rossberg to that effect. After some discussion with the respondents, Rossberg indicated that he might be able to obtain the funds for them. He explained that he did not have the money himself, but that he thought he could borrow it from his father-in-law in Logan, 86 miles distant. Mr. Holesapple, one of the respondents, testified Rossberg advised the respondents, however, that it would cost them $100 to obtain the necessary funds, but that he (Rossberg) and his employer (Mr. Milton Christensen)

would bear that charge in view of the fact that they were realizing a commission on the sale of the Rohlfing house. Both Mr. Rossberg and Mr. Christensen deny that they agreed to bear the $100 charge.

At the request of the respondents, Rossberg traveled to Logan and borrowed $1500 at six per cent interest from a friend of his father-in-law, the father-in-law vouching for Rossberg's credit. When Rossberg informed the respondents that he had obtained $1500 for them they expressed satisfaction and agreed to meet with him that day to close the transaction, but they failed to do so, and later the same day informed Rossberg that they could not go through with the purchase, The next day Rossberg, his wife, and Mr. Christensen, being of the opinion that the Rohlfing house was a good buy, entered into a contract with the Rohlfings for its purchase. The Rossbergs and Mr. Christensen each made a payment of $1250 to the Christensen Realty Company pursuant to that contract. At the same time another contract was signed by the Rohlfings wherein the respondents were named as buyers. Mr. Rohlfing instructed Mr. Christensen and he agreed that if the respondents became able to purchase, they should be allowed to do so, and the other contract would be destroyed. Later that same day the respondents approached Mr. Christensen and informed him that they had changed their minds and would like to purchase the house if Rossberg would loan them $1500. Rossberg agreed to do so and destroyed the contract which he and his wife and Mr. Christensen had entered into with the Rohlfings. The respondents then signed the contract for the purchase of the house which the Rohlfings had signed earlier that day. The respondents also executed a promissory note for $1600 payable in 90 days to Rossberg and his wife, bearing interest at six per cent, and Rossberg paid the sum of $1500 to the Christensen Realty Company for the benefit of the respondents. As security for the

payment of the note, the respondents assigned to the Rossbergs their interest in their contract with the Rohlfings. Respondents understood at that time that the Rossbergs had executed a contract for the purchase of the home and were relinquishing their rights in the property in favor of the respondents. Mr. Holesapple, one of the respondents, testified that in signing the promissory note he understood he was paying a $100 fee for obtaining the money; that he had no knowledge of what constituted usury and did not intend to violate the law; and that he could do nothing else but sign because "they had five hundred dollars of my money" (earnest money), although he admitted Mr. Christensen had told him on several occasions that he would refund his $500 payment if the respondents could not go through with the purchase.

See 15-1-2, Utah Code Annotated 1953, provides:

"The parties to any contract may agree in writing for the payment of interest for the loan or forbearance of any money, goods or things in action, not to exceed, except as otherwise provided by law, ten per cent per annum; * * *."

Sec. 15-1-6 declares void all contracts in which a greater amount of interest is reserved, taken or secured, and sec. 15-1-9 authorizes courts to enjoin suits brought to recover on usurious contracts and to cancel the contract and any security given for the payment thereof.

The appellants assail the judgment rendered below, which declared the note usurious and cancelled the note and the security, on the ground that the evidence fails to establish a corrupt or unlawful intent to violate the usury law. It is well settled in this state that such an intent on the part of the lender, at least, is a necessary element of usury and must be proved. *Cobb* v. *Hartenstein*, 47 Utah 174, 152 P. 424, 430; *Mathis* v. *Holland Furnace Co.*, 109 Utah 449, 166 P.2d 518. In the Cobb case, this court speaking through Mr. Justice Frick said:

"As we have seen * * * in order to establish usury, the existence of an unlawful or corrupt purpose is one of the essential elements which must be clearly proved to exist at the time the contract or transaction which is claimed to be usurious is entered into. Where the contract upon its face is usurious, the intention may be inferred, and the inference may be so strong that no express denial can avoid the same. Where, however, as here, the contract is a legitimate one, and is one that is frequently used by stockbrokers, but it is nevertheless contended that it is a mere shift, cloak, or cover for usury, then it requires substantial evidence of a corrupt or unlawful intent, or some fact or facts from which such an intention may be clearly inferred."

In that case the plaintiff and defendant were stockbrokers engaged in buying and selling stock on commission and on personal account. It was contended by the plaintiff, and the district court found, that contracts which they had entered into whereby the plaintiff purportedly purchased on a margin and the defendant purportedly sold on a margin certain mining stock at an agreed price was in fact a cloak to cover a usurious loan of money between the parties. We reversed the judgment of the district court, holding that in view of the fact that the contracts were not regarded by the parties as loan contracts but were in daily use by stockbrokers on a local stock exchange, there was no evidence of an intent on either party to loan or borrow money at a usurious rate.

In the instant case, it is clear that the transaction between the parties was nothing more than a simple loan of money and that the parties so regarded it. While it is true that there is no evidence that either party had the specific intent to violate any law or understood what constituted usury, the necessary intent to constitute usury is the intent to exact payments which exceed the amount of interest allowed by the statute—not the specific intent to violate the statute. *Manchester Realty Co.* v. *Kanehl*, 130 Conn. 552, 36 A.2d 114; *Atlas Realty Corp.* v. *House*, 123 Conn. 94, 192 A. 564, 567. In the last cited case

the court quoted with approval the following statement from 66 C.J. pp. 177, 178, 179:

"The intent which enters into and is essential to constitute usury is simply the intent to take and reserve more than permitted by law for the loan. * * * By the weight of authority usurious intent is implied if excessive interest is intentionally taken or reserved. * * * If the mistake be as to the legal right to acquire the excessive payment, which is received in good faith, there is nevertheless usury. Ignorance of the law excuses no one, not even an honest money lender."

See *Washington Fire Insurance Co.* v. *Maple Valley Lumber Co.*, 77 Wash. 686, 138 P. 553, to the effect that the law presumes the necessary unlawful intent from the mere fact of intentionally doing that which is forbidden by the statute.

The note in question is not usurious on its face. It provides for the payment of $1600 in 90 days, plus interest at 6%. Both parties readily admit, however, that the respondents only received $1500. Appellants attempt to justify their $100 bonus on the grounds that (1) the transaction was sale of the appellants' credit instead of a loan of money from them, and (2) part of the $100 was to cover Mr. Rossberg's expenses in traveling to Logan to obtain the funds from a third person. As for the first ground urged, it is well established that a sale of credit, as distinguished from a loan of money, does not come within the purview of usury laws. 55 Am. Jur. 343; *Oil City Motor Co.* v. *C. I. T. Corp.*, 10 Cir., 76 F. 2d 589, 104 A.L.R. 240; annotation at 104 A.L.R. 245. But we need not here pursue the technical differences between a sale of credit and a loan of money. Suffice it to say that the mere fact that Mr. Rossberg had to travel to Logan and use his credit to borrow the necessary money from a third party before he could make available the funds to the respondents does not make the transaction between the appellants and respondents a sale or loan of credit instead of a loan of money. *Chakales* v. *Djiovanides*, 161 Va. 48, 170

S.E. 848. As regards the contention that Mr. Rossberg expended part of the $100 in obtaining a loan from a third party, the proceeds of which loan he in turn loaned to the respondents, it is true that a borrower may agree to pay a lender reasonable compensation for services rendered by him in connection with the loan, in addition to the maximum allowable rate of interest. See *Fisher* v. *Adamson*, 47 Utah 3, 151 P. 351, where we held not usurious a loan of $300 at the highest allowable rate of interest even though the borrower had paid the lender, pursuant to an agreement between the parties, ten dollars, in addition to the interest, for examining certain security given for the loan. In the instant case Mr. Rossberg testified that he told the respondents he could get $1500 for them but that it would cost them $1600. He admitted that he did not discuss with the respondents why the $100 bonus was being charged. The evidence fails to establish any agreement, express or implied, between the parties that the $100 or any part thereof was to defray Rossberg's expenses in traveling to Logan to obtain the money.

It cannot be successfully contended that the $100 bonus agreed to be given by the respondents was in consideration of the appellants and Mr. Christensen relinquishing their rights in their contract to purchase the Rohlfing home. The evidence will not support that contention; on the contrary, it negates that contention. The appellants do not even make that contention. Rossberg offered to endeavor to obtain the $1500 for the respondents at the cost of $1600 several days before there was any contract between the appellants and Mr. Christensen and the Rohlfings. At the trial Rossberg was asked on direct examination whether there was any discussion before he went to Logan why the respondents would have to agree to pay $1600 for a $1500 loan. He answered:

"Not particularlarly except for the fact that I told them I felt that that is the amount it would take to be able to secure the money."

On cross-examination, Rossberg testified as follows:

"Q. Did you tell them that the parties from whom you obtained the money would probably want sixteen hundred dollars for the fifteen hundred dollar loan? A. I told them I would be able to get them the money, but it would probably cost them sixteen hundred dollars.

"Q. Will you say that you didn't tell them that the parties from whom you would obtain the money would want sixteen hundred dollars for the fifteen hundred dollar loan? A. I stated my fact, that I told them it would take sixteen hundred dollars to get the fifteen hundred dollar loan."

Thus it is clear that Rossberg intended to charge the respondents a $100 bonus for obtaining the money several days before he became a party to the contract with the Rohlfings for the sale and purchase of their home. There is no evidence that he thereafter changed his mind as to why he was making the $100 charge.

As has been pointed out, at the time the Rohlfings signed the contract with the appellants and Mr. Christensen, they also signed a contract selling the house to the respondents. Mr. Rohlfing testified that he directed Mr. Christensen to allow the respondents to complete their purchase if they became able to do so, and that Mrs. Rohlfing told the respondents that they could have until the next day to complete their purchase. Mr. Christensen testified that he told the Rohlfings that if the respondents changed their minds and wanted to go through with the purchase, "we will step aside and let them have the house." Rossberg testified that he told the respondents after they had changed their minds and wanted to go through with the purchase that "we would let them purchase the property as before agreed." He does not contend that there was any condition or charge attached.

Mr. Christensen was a joint purchaser with the appellants in their contract to purchase the Rohlfing home. Yet both Mr. Christensen and Rossberg admitted that no part

of the $100 bonus was paid to Mr. Christensen nor did Rossberg ever agree to pay any part of the $100 bonus to him. Both Rossberg and Mr. Christensen tesified that they did not discuss between themselves the purpose of the $100 charge. Mr. Christensen testified that the $100 was Rossberg's "own personal. None of it was to accrue to the office, *** or to myself." It would seem that if the parties intended that the $100 bonus was in consideration of the appellants and Mr. Christensen relinquishing their rights in the Rohlfing contract, some arrangements would have been made to pay Mr. Christensen half of the bonus.

Mr. Holesapple, one of the respondents, testified that Rossberg told him that the $100 charge was being made because the party from whom he was to obtain the loan in Logan required it. He further testified:

"I believe it was a sum of money that he had just for that, for quick loans and returns, and he required this hundred dollars' use on it, something on that order."

While it is true that the $100 charge *could have been* agreed to have been paid by the respondents in consideration of the appellants and Mr. Christensen relinquishing their rights in their contract with the Rohlfings, it is clear that such was not the intention of the parties in this case. The evidence clearly establishes that neither Rossberg nor Mr. Christensen intended to charge the respondents anything for relinquishing their rights. They had promised the Rohlfings they would do so if the respondents became able to complete their purchase. It must be remembered that both Rossberg and Christensen knew they would realize a commission on the sale of the house to the respondents, and therefore it is not unnatural that they did not exact consideration from the respondents when they relinquished their rights in their contract with the Rohlfings. Rossberg testified that his commission was $306 on the sale of the house to the respondents.

From the foregoing it is evident that there was evidence from which the trial court could find that the $100 bonus was in fact a charge for the use of the money. While the usury statutes of this state exact severe penalties ▪ for their violation, we cannot in an effort to uphold a loan as nonusurious, make something appear to be consideration for the charge when the parties themselves did not so intend.

The judgment below is affirmed. Costs to the repondents.

McDONOUGH, Justice.

I concur. I also concur in the comments of Mr. Justice CROCKETT.

CROCKETT, Justice.

I concur. It is natural enough to sympathize with the plaintiff, who is not in the money lending business, because of the loss of his loan. But we are here dealing not only with the parties to the instant transaction, but with principles which must apply uniformly to lenders and borrowers of money.

The statutes proscribing usury were enacted for a beneficial purpose: to prevent the exaction of exorbitant charges for the use of money. The penalty of forfeiture of the debt is severe but salutary. It is appreciated that the invocation of such penalty should not be done lightly, and that the defense will not be allowed unless there is a "corrupt or unlawful intent to violate the usury statute."[1] Notwithstanding the foregoing, all that is required is that the evidence show clearly and unequivocally that the lender knowingly charges interest at a rate in excess of that permitted by law;[2] he must be presumed to intend the natural and probable consequences of his act and held to suffer the consequences.[3]

---

[1] *Cobb* v. *Hartenstein*, 47 Utah 174, 152 P. 424, 428.
[2] *Smith* v. *Parsons*, 55 Minn. 520, 57 N. W. 311.
[3] See 22 C.J.S., Criminal Law, § 35, p. 93.

Once the requirements of the foregoing rule have been met, it is improper to permit the lender to seek around for every possible excuse to avoid the consequences of his conduct; to do so would nullify the effects of the usury statute. It is of no avail to theorize that if Mr. Rossberg had sold his equity in the property to the Holesapples for $100, there would have been no usury. We cannot indulge in any assumption that it either was or might have been such a sale. The case was not tried on that theory; the evidence does not show that to be the fact; the evidence is that Rossberg told the Holesapples that "they would have to agree to pay sixteen hundred dollars for the fifteen hundred." The trial court found that the charge of the extra $100 was for interest on the loan of the money. This finding is supported by substantial competent evidence, wherefore this court is powerless to disturb it.

The same process of reasoning destroys the suggestion that perhaps it was worth $100 (the usurious portion thereof) for Rossberg to go to Logan to get the money. If a lender of money is going to make charges for additional services in connection with a loan, he should be required to prove that he is entitled to such charges by proof sufficient to permit him to recover upon a theory of contract for such services. It would have to appear either (a) that the parties expressly agreed that the usurious charge was to be paid to Rossberg for the purpose of going to Logan to obtain the money or (b) that the circumstances were such that an implied contract to pay for such services existed. The evidence does not show either express or implied contract and the court made no such finding, but found to the contrary.

The trial court's findings, being supported by substantial competent evidence, cannot now be disturbed; that being so, his conclusion that the loan was usurious is likewise unassailable.

HENRIOD, Justice.

I dissent. The very facts related in the majority opinion make it appear that Rossberg's specific intent was to sell a house, — not to loan money at an usurious rate. The intent to exact money at an usurious rate must be shown by clear and satisfactory evidence.[4] Hardly can it be said that there is such clear and satisfactory proof, where Rossberg, primarily a realtor, got the Holesapples to sign a binding contract to buy a house, accepted $500 from them as a down payment, which he could have retained, volunteered to return it when the Holesapples reneged on their bargain, signed a contract to buy the house himself, but again permitted the Holesapples to change their minds and sign up for the house anew, tore up his own contract and sacrificed a vested right in their favor, and spent a day and the expense incident thereto in going 172 miles to get $1500 for the accommodation of the Holesapples.

The majority opinion makes much of Rossberg's statement that the parties from whom the money was to be obtained would want $1600 for the $1500. One wonders what the majority would conclude had Rossberg obtained the money from an industrial loan company, when we recently approved a charge by such a company of 37% interest, far in excess of the percentage involved in this case.[5]

The law frowns on penalties and forfeitures, and will give no sanction to them unless justified by strong and unequivocal proof, — lacking here.

WADE, Justice (dissenting).

I agree that no intention to violate the usury law is necessary, it is sufficient if there is an intention to enter into a contract which in fact violates that law. On that question the narrow issue is whether from the evidence it is

[4] 55 Am.Jur. 437, Sec. 164.
[5] *Seaboard Finance Co.* v. *Wahlen,* 123 Utah 529, 260 P. 2d 556.

within the bounds of reason to infer that these parties intended that the extra $100 was an additional interest charge on the loan of $1500, and did not intend that it was a charge for services performed or property rights surrendered by appellants thus increasing the principal of the loan to $1600, in accordance with the provisions of the note. In view of the evidence and the trial court's finding I am not prepared to hold as a matter of law that appellants did not intend this extra charge to be interest, although I think the trial court might reasonably have so found.

This case and the recent case of *Seaboard Finance Co.* v. *Wahlen,* 123 Utah 529, 260 P. 2d 556 which were pending in this court at the same time, bring graphically to our attention the great possibility for injustice under the present usury law. In that case we held that a charge of 37% interest is permitted to industrial loan corporations. Here we hold that individuals who charge more than 10% interest are guilty of usury and lose all of the principal and interest of the loan. This is true although the appellants in making the loan acted fair in every detail in their dealings with the borrowers, respondents here. In order to enable the borrowers to purchase a home appellants borrowed the $1500 from other people on their own credit, and then after the borrowers said they could not complete the purchase, they entered into a contract to buy the property as joint purchasers with another, still reserving the right in the borrowers to purchase it if they should change their minds. Later the borrowers did change their minds and appellants destroyed their contract of purchase and surrendered their interest in their property to the respondents and loaned them the $1500, and in the note which they took therefor they added an extra $100 making the principal sum of $1600 with interest at the rate of 6% per annum for 90 days.

This money was made available to respondents on the credit of the appellants for which appellants, had they

changed the transaction slightly, could have legally charged this $100. Appellants, in order to make this loan, had to travel about 172 miles, and spend a day of their time, for which they were entitled to make a charge. They surrendered their right in this home which they and the real estate company had contracted to purchase, and had they had any idea that what they were doing constituted usury, they could have required the additional $100 as payment for that right. Then when they try to collect on the note the respondents raise the defense of usury, after accepting all the benefits which appellants have bestowed upon them. There is no claim that in any of these dealings appellants acted unfairly or in any way misrepresented anything.

The usury laws sets aside and makes void a contract which would otherwise be binding. It is done for the benefit and protection of the borrower, and can be justified under the constitution only on the ground that such contract is unfair, and unconscionable to him. Certainly in this case there was no unfairness to the borrower, but by this law he was enabled to do the appellants a grave injustice and hardship. This seems to be somewhat akin to the situation created by the statute of frauds which induced the saying that the courts will not allow that statute to be used to perpetrate a fraud.

Undoubtedly the statute was originally enacted to curb what is referred to as the loan shark business. It was intended to curb unconscionable charges made by professional lenders of money. But our statute, although very rigid and harsh in its remedy, now allows exceptions to its strict provisions in favor of the very people it was originally intended to curb.[6] As we have noticed in the Seaboard Finance Co. case an industrial loan company may charge as much as 37% interest on its loans with impunity. I cannot

---

[6]See section 7-8-3, U.C.A.1953, and section 7-10-13.

understand how our usury statute is constitutional when the evil which it was intended to curb is expressly permitted to flourish under exceptions to that statute.