[L. A. No. 29496. In Bank, Sept. 11, 1969.]

JEROME BURR et al., Plaintiffs and Appellants. v. CAPITAL RESERVE CORPORATION, Defendant and Appellant.

Sam Houston Allen for Plaintiffs and Appellants.

Abraham Gorenfeld and Ellis J. Horvitz for Defendant and Appellant.

MOSK, J.—The litigants here are at odds over whether three financial transactions in which plaintiffs purportedly leased personal property from defendant were in fact loans at a usurious rate of interest. The trial court concluded that the first two transactions were bona fide leases of personal prop-

erty but that the third was a loan of money and that the rate of interest was usurious.[1] It granted judgment for the total amount of interest plaintiffs had paid on account of the third transaction.

Defendant is a corporation engaged in the business of leasing personal property, which it purchases for that purpose. Plaintiff Burr operated an ice-skating rink in Culver City in 1963 and desired to open a family billiard parlor, at that time a novel enterprise.[2] He selected the carpeting, pool tables and other equipment needed for the new venture and discussed with two brokers who were partners the means by which he could obtain the items. The brokers had dealings with defendant in the past and had received commissions for securing business for defendant.

A meeting was held among Burr, the brokers, and Michael Savage, defendant's president. Savage explained to Burr that defendant would be required to borrow the money from a bank to purchase the equipment and that since the family billiard parlor business was of a speculative nature, the bank from which defendant would borrow the money required collateral over and above the equipment itself. The amount Burr would be required to pay as rental for the equipment was calculated by ascertaining the number of years for which the leases were to run and, according to Savage, "you simply use a figure which is based on the return that you want to receive on equipment that you own and multiply it by the cost of the equipment to give you your payment." Defendant desired a return of $35 for each $1,000 to be paid out, and on this basis it entered into a contract with Burr.

Under terms of the agreement Burr pledged stock with a value of $70,000 to defendant to secure the obligations under two leases. Defendant paid the supplier of carpeting for the billiard parlor the sum of $5,417. The invoice for this purchase was issued to defendant, who was designated as the buyer, but the carpeting was delivered to Burr. As a part of the transaction, Burr executed a lease form (hereinafter called Exhibit A) under which he agreed to pay $568.80 upon execution and to make 33 monthly payments of $189.60 each. A similar arrangement was made as to other equipment. Pool

---

[1] The maximum permissible rate of interest is 10 percent per annum. (*Heald* v. *Friis-Hansen* (1959) 52 Cal.2d 834, 838 [345 P.2d 457]; Cal. Const., art. XX, § 22.)

[2] The plaintiffs are Burr and his wife, doing business as the El Rancho Family Billiard Parlor. For literary convenience, Burr will be referred to as the sole plaintiff.

tables and other property selected by Burr were delivered to him. Defendant paid $39,060.04 to the supplier for this equipment and was named as the purchaser in the invoice. Burr signed another lease (hereinafter called Exhibit B) and paid defendant $4,942.50 upon execution. Under Exhibit B he obligated himself to make 34 payments of $884.97 each.

Exhibits A and B, which were executed in May 1963, provided inter alia that the lessee would have no title or interest in the property which was the subject of the lease, that he would return the property to the lessor upon the expiration of the term, and that the lessor had the right to assign the lease and its proceeds. There was also a provision that if the lessee defaulted in his payments the lessor could immediately terminate the lease, declare all the payments under it immediately due and payable, and repossess the property. The lessee assumed the entire risk of loss "from hazard" and agreed to keep the property insured at his own expense for the lessor's benefit. Finally, the lessee was accorded an option to renew the lease for one year at the same rental. Savage testified that at the end of the term he expected Burr to renew the lease, return the property to defendant, or trade it in.

The money to purchase the equipment was borrowed by defendant from the Union Bank at an interest rate of 10 percent. Defendant gave the bank a promissory note and as security for the loan it assigned the leases and their proceeds to the bank. It also repledged to the bank the $70,000 in stock which Burr had pledged as security.

In early 1964 Burr proposed to open a second billiard parlor. In order to finance this expansion, it was necessary for him to sell the stock which he had pledged to defendant and the latter had repledged to the bank. The bank would release the stock only upon condition that Burr deposit $15,000 in cash as security in a savings account at the bank.

Burr entered into the third transaction with defendant in response to his expansion need. He obtained the money to make the deposit from defendant by "selling" to defendant equipment he owned in his business, such as a stove, steam table, cash register and air conditioner, and "leased" it back from defendant. Savage told Burr that "the only way we could work out a loan" was if Burr would "sell the property" to defendant and Burr would "get . . . the money back." Prior to the time the third transaction was consummated, Savage explained to Burr that under the sale and leaseback he could obtain a far higher percentage of the value of

the property than if he obtained an unsecured loan or a chattel mortgage on the equipment and that certain other advantages, such as tax benefits, would flow from a sale and leaseback arrangement.

Burr listed the items he desired to sell to defendant and Savage selected those it was willing to purchase. As additional collateral to secure the "rental" payments Burr assigned to defendant equipment located at another billard parlor.[3] An escrow was opened for the transfer of the property. Burr executed a lease form (hereinafter called Exhibit C) with terms identical to those provided in Exhibits A and B. Exhibit C recited that Burr leased the specified property from defendant and that $1,675 was due on execution. Burr was to make 24 monthly payments of $787.25 each. However, the $1,675 was not paid. Burr actually received $15,075 from this transaction, $15,000 of which was deposited in escrow.[4] He retained possession of the property at all times.

Defendant borrowed the $15,075 from the Union Bank for the purchase of this equipment, and as in the prior transactions it assigned the lease as security for the payment of the loan it received from the bank.

In January 1965 Burr sought the release of the $15,000 which was deposited as security in the savings account at the Union Bank, claiming that when he entered into the agreements with defendant he had been granted options to purchase the property leased to him. Savage denied that such options existed. Later he wrote Burr that defendant would grant purchase options to him for the property represented by all three leases upon payment of a sum which amounted to three months' rental on each lease.[5]

Burr defaulted in his payments in April 1965, and Savage informed him that the bank would resort to the $15,000 secur-

---

[3] There is some confusion in the record regarding the status of the additional equipment. It appears, although not clearly, that defendant ultimately claimed ownership under Exhibit B because it was located at a billiard parlor in which the equipment covered by Exhibit B was installed. That document contains a provision that "All . . . equipment placed in or upon said property shall become a component part thereof and the title thereto shall immediately be vested in the lessor and shall be included under the terms hereof."

[4] The additional $75 apparently covered the expenses of the "sale."

[5] In the letter offering the options, Savage wrote, "for tax reasons those persons who desire to have a purchase option have always wanted the option in a separate letter so that it remains an option outside of the lease and does not cause the lease to be a conditional sales contract. If the option is exercised, the lease could, in our opinion, become a sales contract."

ity deposit if the default was not corrected. Thereupon defendant and Burr worked out an arrangement under which Burr would accomplish the release of the $15,000 security deposit and, in addition, be relieved of his obligations under Exhibits A and C. The $15,000 deposit was released by the bank and this sum was used to pay off Burr's obligations under Exhibits A and C and to pay the option prices for the property represented by those documents. Defendant gave Burr a bill of sale for this property. In addition, defendant paid the Union Bank the amount still due under Exhibit B and assigned the rentals due under it to a second bank as security for the payment of future sums. Burr began to make payments under the new arrangement in July. He filed this action shortly thereafter.

Defendant expended $5,417 on Burr's behalf in the first transaction, and Burr paid out $7,394.40, or a total of $1,977.40 over what he received. As to the third transaction, Burr received $15,075 from defendant and paid out $21,180.75, a total of $6,105.75 over the sum he received. The terms of Exhibit B required Burr to pay $52,740.88, of which $34,146.51 had been paid by July 1, 1966, leaving a balance of $18,584.37 still due.[6] Defendant had paid out $39,060.04 on Burr's behalf in the second transaction.

The trial court concluded that the transactions represented by Exhibits A and B "are not loans of money . . . but are leases of the personal property involved by the defendant to the plaintiffs, with an option to the plaintiffs to acquire title to the said property provided plaintiffs make all of the monthly payments required by the said Exhibits and in addition thereto, a sum equivalent to 3 equal monthly payments thereunder."

The court found that Burr "assigned" title to the personal property represented by Exhibit C to defendant "only for the purpose of securing the obligations under . . . Exhibit C" and that Burr paid nothing to defendant upon execution of that document despite the assertion in the instrument that $1,675 was due on execution. The court concluded that this transaction was "not a lease but a loan of money and the lease form employed by the parties was but a device used in an effort to evade the usury law of the State of California."

[6]The trial court miscalculated in its findings, asserting the balance to be $18,604.37. In its judgment the court recited the balance as $18,584.37. The mathematically correct figure is $18,594.37. (Since Burr did not rely upon this variance and it is de minimis, we adopt the sum specified in the judgment.)

t was held that the $6,105.75 paid by Burr for the "loan" xceeded the allowable interest rate and that Burr was entiled to have that amount credited to the sum still due under Exhibit B, but that he was not entitled to treble damages.

Both parties appeal from the trial court's judgment. Burr ontends that the first two transactions were in fact usurious oans of money disguised as leases and that he is entitled to reble damages as a matter of law in connection with the third ransaction. Defendant maintains that the third transaction vas in fact a lease, as it purported to be on its face, and that he trial court erred in holding otherwise.[7]

The principles to be applied in deciding the issues before us re well settled. ■ In determining whether a transaction onstitutes a loan, the significant consideration is the subtance of the transaction rather than its form or the terminology used by the parties. (*Thomas* v. *Hunt Mfg. Corp.* (1954) 42 Cal.2d 734, 740 [269 P.2d 12]; *Milana* v. *Credit Discount Co.* (1945) 27 Cal.2d 335, 340 [163 P.2d 869, 165 A.L.R. 621].) *Milana* warned us that "lenders, intent on collecting compensation for the use of money in excess of the awful rate, seek to avoid transacting their business in the orm of loans. The courts have been alert to pierce the veil of any plan designed to evade the usury law and in doing so to disregard the form and consider the substance." (27 Cal.2d at p. 340.) ■ Although intent is an element of usury, a onscious attempt to evade the usury law is not necessary, and usury may be found where there has been only a conscious and voluntary taking of more than the legal rate of interest. [3] The existence of the requisite intent is always a question of fact. (*Thomas* v. *Hunt Mfg. Corp., supra*, at p. 740.)

Within their four corners Exhibits A, B and C project the appearance of leases of personal property. They all provide that Burr will acquire no title to the property, that he will return it to defendant at the expiration of the term if he does not exercise his option to renew the lease, and that defendant may terminate the lease and repossess the property in case of default.[8] When we pursue our inquiry into the circumstances

[7]We are, of course, bound by the rule that the facts and reasonable inferences therefrom are to be viewed in a manner favorable to the trial court's judgment. The facts are related, therefore, in a manner favorable to defendant in the first two transactions and favorable to plaintiff in the third.

[8]The provision that the lessee assumes the entire risk of loss "from hazard" is somewhat unique in a lease since such risk is ordinarily borne by the lessor. (See Civ. Code, § 1932, subd. 2.)

990

under which the leases were negotiated, howev̇er, significan
differences appear between the first, two transactions and th
third.

### The Third Transaction

In the transaction culminating in Exhibit C, Burr did no
seek the use of goods but a loan of money. Savage told Bur
that he would lend him the money he needed only if Bur
would sell his property to defendant and agree to lease i
back. Burr retained possession of the property in spite of th
"sale" and the $1,675 recited to be due on execution was no
in fact paid by him. Furthermore, he assigned additiona
property as "collateral" for the payment of the "rentals'
under Exhibit C. The receipt of money by the borrower from
the lender followed by a fictitious "sale" of the borrower'
property to the lender with provision for repayment in th
form of rentals or payments under a conditional sale contract
and the fictitious recitation of a "down payment" in th
"lease" or "conditional sale contract" have been held t
indicate that a usurious loan transaction has occurred. (*Lie-*
*belt* v. *Carney* (1931) 213 Cal. 250 [2 P.2d 144, 78 A.L.R.
405]; *Blodgett* v. *Rheinschild* (1922) 56 Cal.App. 728 [206 P.
674].)[9]

In *Milana* v. *Credit Discount Co.* (1945) *supra,* 27 Cal.2d
335, 339-340, it was said, "A sale is the transfer of the prop-
erty in a thing for a price in money. The transfer of the prop-
erty in the thing sold for a price is the essence of the transac-
tion. The transfer is that of the general or absolute interest in
property as distinguished from a special property interest. A
loan, on the other hand, is the delivery of a sum of money to
another under a contract to return at some future time an
equivalent amount with or without an additional sum agreed
upon for its use; and if such be the intent of the parties the
transaction will be deemed a loan regardless of its form. . . .

[9]In *Liebelt* the borrower owed money on a conditional sale contract.
The lender paid the amount due on the contract and the borrower gave
the lender a bill of sale to the property. The lender and borrower then
entered into a new conditional sale contract which recited a fictitious
payment by the borrower to the lender upon execution of the contract.
In *Blodgett* the borrower was also indebted under a conditional sale con-
tract and obtained from the lender money over and above the amount
due on the contract. He paid the contract price and transferred title to
the property to the vendor as security for the payment of the loan. The
lender then "leased" the property back to the borrower for a specified
term, at the end of which title would revert to the borrower for the
payment by him of one dollar. In each of these cases it was held that a
loan at a usurious rate of interest had occurred. (See also *Bonestell* v.
*Western Automotive Finance Corp.* (1924) 69 Cal.App. 719 [232 P. 734].)

In a sale the delivery of the absolute property in a thing and the receipt of a price therefor consummate the transaction. In a loan the initial transaction creates a debit and credit relationship which is not terminated until replacement of the sum borrowed with agreed interest.''

Under all the circumstances, there was sufficient evidence here from which the trial court could have concluded that, pursuant to the essence of the third transaction, defendant would deliver to Burr a sum of money under a contract to return it at some future time with an additional sum agreed upon for its use and thus there was created a debit and credit relationship which was not terminated until the sum Burr had borrowed had been replaced with interest.

Defendant maintains that the usury law does not apply to a bona fide purchase and sale and that the existence of an option to purchase does not establish that the transaction was a loan. The trial court determined, however, on the basis of sufficient evidence that the third transaction was not a bona fide sale but a loan disguised as a sale, and clearly the fact that a purchase option was given by defendant after the leases were signed did not play a determinative part in the court's conclusion since such options were given as to all three transactions and only the third was found to be usurious.[10]

Defendant contends that the third transaction is not usurious even if it constitutes a loan because a lender may charge a borrower an extra and reasonable amount for additional incidental expenses in negotiating, brokering, making, and securing the transaction, and that such charges are not treated as interest. (*Charlotte Guyer & Associates* v. *Franklin*

[10]Cases such as *Verbeck* v. *Clymer* (1927) 202 Cal. 557 [261 P. 1017] and *Giometti* v. *Etienne* (1933) 132 Cal.App. 602 [23 P.2d 52, 25 P.2d 826] involved distinguishable factual situations in which it was held that a sale rather than a loan was intended. *Batchelor* v. *Mandigo* (1950) 95 Cal.App.2d 816 [213 P.2d 762] is cited by defendant for the proposition that a joint venture rather than a loan may occur if a party seeks to obtain goods rather than money for the purpose of entering into a new and speculative venture and accepts the financial interest of a lender. In the third transaction Burr desired money rather than goods and ''sold'' his property to defendant to obtain the funds he needed. Defendant also cites *Stafford-Lewis* v. *Wain* (1954) 128 Cal.App.2d 614 [276 P.2d 157], in which the trial court found that a sale of stock by plaintiff to defendants with an option in plaintiff to repurchase at a higher price did not constitute a usurious loan. There, however, the defendants made it clear to the plaintiff that they did not intend a loan of funds and that such a loan would be usurious; the plaintiff's attorney suggested a sale with an option to repurchase and, after researching the law, he advised one of the defendants that the transaction was legal. Obviously, the instant case is factually distinguishable.

*Factors* (1963) 211 Cal.App.2d 690, 694 [27 Cal.Rptr. 575].)[11] The only charge pointed to by defendant in connection with the third transaction is the 10 percent interest it paid the bank for the money it borrowed to "buy" Burr's property. A number of cases have held that a loan is not usurious if the lender charges the borrower, in addition to the full legal rate of interest, an additional amount representing interest actually paid by the lender to a third party from whom he secures the money. (See cases collected in 91 A.L.R. 2d 1389.) There are some cases which hold to the contrary. (See, e.g., *Smith* v. *Eason* (1954) 223 Ark. 747 [268 S.W.2d 389, 390-391]; *Bowden* v. *Gabel* (1937) 105 Mont. 477 [76 P.2d 334, 336-337].)

 Those cases which permit a lender to charge the borrower for the lender's cost in obtaining funds hold that the borrower must consent in advance to reimburse the lender for such costs. (*Chandler* v. *Cooke* (1931) 163 Miss. 147 [137 So. 496, 498]; *Rossberg* v. *Holesapple* (1953) 123 Utah 544 [260 P.2d 563]; and see cases collected in 91 A.L.R.2d 1389, 1398-1400.) Thus, even if we were to hold that the defendant may charge Burr for the interest it was required to pay to the bank the loan involved in the third transaction would be usurious because there was no evidence that Burr consented to pay defendant the 10 percent interest it paid to the bank. That Burr may have been aware defendant would be required to borrow the $15,000 from a bank does not justify an inference that he consented to reimburse defendant for this expense. (*Chandler* v. *Cooke, supra,* 163 Miss. 147 [137 So. 496, 498].)

 Defendant next urges that Burr cannot recover because defendant, with Burr's knowledge, assigned Exhibit C to the Union Bank as security. It is claimed that because of this Burr's only recourse is against the bank.[12] The sole authority cited for this proposition is *Liebelt* v. *Carney* (1931) *supra,* 213 Cal. 250. There the lender made an absolute assignment of the proceeds of the usurious loan to a financial

---

[11]It has been held that such charges "must be confined to specific service or expense incidental to the loan incurred in such a way as to absolutely preclude its being merely a device through which additional interest or profit on the loan may be exacted, and in this connection the court will carefully scrutinize the whole transaction and declare its substance regardless of form." (*Haines* v. *Commercial Mortgage Co.* (1927) 200 Cal. 609, 616 [254 P. 956, 255 P. 805, 53 A.L.R. 725].)

[12]Defendant states that Burr had originally joined the bank in the suit but elected to dismiss the action against the bank because article XX, section 22, of the California Constitution provides that the usury laws do not apply to a bank operating under state or federal laws.

institution and it was held that since the latter received all the usurious payments under the illegal agreement it, rather than the party who entered into the usurious loan contract, was the proper defendant. We need not decide whether the *Liebelt* concept retains vitality today, for the present case is clearly distinguishable since here defendant received the benefit of the usurious interest payments.[13]

Finally, defendant maintains that even if the third transaction was tainted with usury a new "agreement" was made when Burr's obligations under Exhibits A and C were paid from the security deposit in the summer of 1965, defendant paid off its loan to the bank which was secured by the payments due under Exhibit B, and those payments were assigned to another bank. It is claimed that this new arrangement extinguished any liability defendant may have had for usury under Exhibit C.

. Only *Credit Finance Corp.* v. *Mox* (1932) 125 Cal.App. 583 [13 P.2d 937] is cited by defendant in support of this contention. There, the borrower claimed that a transaction was usurious and entered into a compromise and settlement agreement with the lender under which the amount both parties believed to constitute usurious interest was deducted from the amount of the borrower's indebtedness and a new agreement consummated. The borrower thereupon released all claims against the lender. Subsequently, the lender brought suit upon the new obligation and the borrower pleaded usury as a defense. The trial court found that the usurious payment was larger than the amount the parties had specified in their agreement but gave judgment for the lender nevertheless because of the compromise and release. The instant case is clearly distinguishable since here there was no compromise, release, or settlement of any claim involving usury. Burr merely paid off the entire amount due under Exhibit C, which amount included $6,105.75 in usurious interest, and Burr's obligations under an entirely different transaction were assigned to another bank.[14]

---

[13]Savage testified that the $15,000 security deposit was released by the bank so that the money in the account could be used to pay defendant the amounts owed under the agreement and that defendant was paid off as a part of the arrangement. Defendant's answer also makes it clear that defendant obtained the full balance due under Exhibit C from the $15,000 security deposit.

[14]There was no agreement that the termination of Burr's obligations to the Union Bank under Exhibits A, B and C were dependent upon one another. It should be noted that although payments under Exhibit C

For the reasons stated above the trial court acted properly in holding that the $6,105.75 paid by Burr on account of the third transaction constituted a usurious exaction. Burr contends that the trial court erred in failing to award him treble damages for this sum. (Stats. 1919, p. lxxxiii, § 3; Deering's Gen. Laws, Act 3757, § 3.) The granting of treble damages upon a finding of usury is a matter within the trial court's discretion. (*Golden State Lanes* v. *Fox* (1965) 232 Cal.App.2d 135, 142 [42 Cal.Rptr. 568].) The circumstances of this transaction do not persuade us that the trial court's discretion was abused.[15]

## The First and Second Transactions

The first two transactions differ significantly from the third, for in these Burr desired to obtain from defendant not money but the use of property which he did not have the funds to purchase. He did not, as in the third transaction, fictitiously "sell" his own property to defendant and "lease" it back. Moreover, there was no discussion between Burr and defendant regarding a loan of money in the first two transactions, as there was prior to the time the third transaction was consummated. Defendant retained title to the property and intended at the expiration of the lease term that Burr would either return the property or renew the leases. If defendant had been the manufacturer of the equipment Burr desired or a dealer in the business of supplying equipment there is little doubt that the transactions would have been deemed to constitute either leases or conditional sales.[16]

---

were to be made over a two-year period, Burr paid the full amount due after approximately one year and that he paid the full amount due under Exhibit A after it had run for two years, although the lease term was for three years.

[15]Burr relies upon the fact that defendant failed to reconvey to Burr at the time Exhibits A and C were paid off the property which defendant had acquired from Burr as "additional collateral" under Exhibit C. The trial court adjudged Burr to be the owner of this property. The record is rather confused as to the basis of defendant's claim to ownership of these items. (See fn. 3, *ante*, p. 6.) That defendant may have unjustifiably claimed title to the property does not compel a conclusion its conduct was so shocking that treble damages must be awarded as a matter of law.

[16]Although no cases have been cited or found characterizing a similar situation to that involved in the first two transactions in the context of usury, a number of courts have considered the nature of such a transaction from a tax viewpoint. Thus, when a party enters into an agreement to rent equipment and the lease contains a provision that the lessee may purchase the property at the end of the lease term, the transaction is ordinarily held to be a conditional sale rather than a lease. (See Note, *A Lease By Any Other Name: Or When is a Lease a Conditional Sale?* (1964) 44 B.U.L.Rev. 103.)

Under all the circumstances we cannot say as a matter of law that the essence of these transactions was a usurious loan of money.

The parties have placed great emphasis upon the question whether prior to 1965 options were granted by defendant to Burr to purchase the equipment at the expiration of the lease term. The evidence shows that such options were not discussed with Savage until 1965 but Burr claimed and attempted to show at the trial that the brokers who first approached him regarding the transactions represented by Exhibits A and B had told him that when the rental payments were completed title would pass to him without further payment. The trial court excluded evidence of conversations between Burr and the brokers on the ground defendant was not bound by the brokers' statements since there was no showing that an agency relationship existed between them and defendant.

Savage testified that the brokers "went to any one of a number of leasing companies, depending on the type of equipment which was involved, and they would then negotiate to get a commission if they were successful in having the leasing company lease the particular equipment to the potential customer." Defendant had an arrangement to pay a commission on any business obtained by the brokers, and it had previously paid commissions to them for such services. Burr had never heard of defendant before the brokers approached him. Before Burr met Savage, the brokers called on the latter and told him that Burr desired to lease some equipment from defendant. The amount of equipment Burr desired, its cost, and the nature of the collateral the bank would require in the light of the speculative nature of Burr's new venture were discussed. When Burr met Savage later, they spoke about the amount of the payments and the manner in which they were calculated. Defendant prepared Exhibits A and B and one of the brokers took the papers to Burr for his signature.

The trial court held that an agency relationship had not been established by this evidence because the brokers "are apparently independent operating brokers as defendant testified, who go from place to place. You can't very well call them agents of any particular person. . . ."

The existence of agency is a question of fact for the trial court. (*Brokaw* v. *Black-Foxe Military Institute* (1951) 37 Cal.2d 274, 278 [231 P.2d 816].) The evidence recited above was sufficient for the trial court to conclude that the

brokers were not employed as agents of defendant even though entitled to a commission if they obtained business, that Savage negotiated the terms of the agreements directly with Burr when they met prior to the time Burr signed Exhibits A and B, and that the fact one of the brokers took those documents to Burr for his signature did not compel a conclusion that the brokers were agents of defendant for the purpose of negotiating the leases. ■ Nor was an ostensible agency established as a matter of law (Civ. Code, § 2300)[17] since the trial court was not compelled to conclude that defendant intentionally or by want of ordinary care caused Burr to believe that the brokers were agents of defendant.

■ Burr points out that possession by the borrower of the goods prior to the time he obtains money from the lender is a significant factor in indicating that a transaction is a loan rather than a lease.. (*Liebelt* v. *Carney* (1931) *supra,* 213 Cal. 250; *Blodgett* v. *Rheinschild* (1922) *supra,* 56 Cal.App. 728.) In *Blodgett* and *Liebelt* the borrowers had possession of the goods under conditional sale contracts from third persons before they approached the lenders for a loan. Burr asserts he had possession of the property covered by Exhibits A and B before he obtained the "loan" from defendant since that property was delivered to him prior to the time he signed Exhibits A and B. It is evident, however, that the purchase of the goods by defendant from the supplier, their delivery to Burr, and the signing of the leases were interrelated events, each dependent upon the other. The trial court was entitled to find that the sequence of these events was of no substantive significance in determining the real nature of the transactions.

The judgment is affirmed. Each side shall bear its own costs on appeal.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

[17]Section 2300 of the Civil Code provides, "An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him."